**UNITED STATES of America,
Appellee,**

v.

**Len CHANDLER, Defendant-Appellant.**

No. 469, Docket 31036.

United States Court of Appeals
Second Circuit.

Argued June 12, 1967.

Decided July 12, 1967.

**994**

Mordecai Rosenfeld, New York City (Abbott A. Leban, Irvington, N. Y., Peter C. Clapman, Forest Hills, N. Y., on the brief), for defendant-appellant.

Peter Fleming, Jr., Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, John E. Sprizzo, Asst. U. S. Atty., on the brief), for appellee.

Before HAYS and FEINBERG, Circuit Judges, and McLEAN, District Judge.*

FEINBERG, Circuit Judge:

In November 1965, a rally was held in Union Square for the announced purpose of burning draft-cards to protest the war in Vietnam. Four of the participants were subsequently prosecuted for that act under 50 U.S.C.App. § 462(b) (3). One pleaded guilty; the other three were tried before Judge Murphy sitting with-

out a jury and were found guilty of violating that statute. Their convictions have recently been appealed to this court, Docket Nos. 31035–37, argued June 26, 1967. However, still another aftermath of the same draft-card burning rally is now before us—an appeal by Len Chandler from a conviction for criminal contempt entered by Judge Murphy for refusal to answer a question put to him by the judge. Chandler's asserted reason for his silence was his Fifth Amendment privilege. For reasons given below, we reverse the judgment of conviction.

At the 1965 rally, one of the draft-card burners was Marc Edelman, who had some difficulty in getting his card to burn. According to Edelman's testimony at his trial, he tore it in half and tried to burn each piece; when this was not completely successful, he threw the singed halves to the crowd. About a week after the rally, appellant Chandler, who was a friend of Edelman, told him that he had found one of the halves. Edelman told Chandler "to keep it that [Edelman] didn't want it." Edelman was thereafter indicted in December 1965. Nevertheless, Chandler kept the remnant for eleven months "as a memento * * * * in a safe place as a valuable." A few days before the trial, however, Chandler returned the portion of the card when Edelman's counsel requested it.

This information was brought out by Edelman as a witness in his own defense under questioning by his counsel and the court. The Government asked only one question on cross-examination: "I do not imagine Mr. Chandler knew you were under indictment, did he?" Edelman responded that Chandler did know it. Then both sides rested. However, Judge Murphy immediately had appellant Chandler subpoenaed as a court witness. According to the Government, Chandler's testimony could have been relevant on two complicated theories discussed in the margin.[1] Whatever the reasons for calling

---

* Of the Southern District of New York, sitting by designation.

1. The first is that Edelman may have lied. Thus, if Chandler's testimony had shown

that Edelman's story—termed "bizarre at the least" by the Government—were false in that Edelman had himself kept the card remnant after the rally, his defense of "open protest" would have been prov-

Chandler as a witness, there is no question that he was served on Friday, October 21, 1966, with a subpoena commanding him to appear, that he thereafter acquired counsel (Harold R. Rothwax) on an emergency basis, and that on Monday, October 24, 1966, he appeared before Judge Murphy. The following colloquy, *inter alia,* thereupon took place, after appellant was duly sworn:

By the Court:

\* \* \* \* \* \*

Q. What I wanted to ask you about were the circumstances under which you received or found this half of the draft card which has been marked as Exhibit AE for identification in this case. Do you see it there? You may take it in your hand. Do you recognize it? A. I respectfully refuse to answer on the ground that my answer might tend to incriminate me.

Q. You had better explain that to me or perhaps you wanted to explain why that answer would tend to incriminate you. I do not understand why it would.

Mr. Rothwax: I do not believe that the witness said it would tend to incriminate him. He said it might.

The Court: There has to be some explanation. I can make a decent guess if he would tell me something, but just asking him what the circumstances were under which he allegedly had possession of it I do not see how that would tend to incriminate him.

Mr. Rothwax: I understand that this was a Selective Service document and I have not, myself, seen it.

The Court: You may look at it. It appears to be half of a Selective Service card.

Mr. Rothwax: I accept your Honor's description of it. It is probably, or

is it definitely, now evidence in this particular case. It might very well be that Mr. Chandler's possession of it was in violation of federal law. It might very well be that his possession of it might be part of an ultimate charge that he conspired with others to obstruct justice, or that he withheld evidence that was relevant in a federal case, and for those reasons I feel that he is justified in standing on the Fifth Amendment in refusing to answer.

By the Court:

Q. Where do you live? A. I live at 645 Water Street.

Q. Are you a musician by profession? A. Yes, I am, sir.

Q. Do you know Mr. Edelman? A. Yes, I do, sir.

The Court: I am not completely satisfied that he has persuaded me or you that the answer to my question would tend to incriminate him.

Mr. Rothwax: Your Honor, as I understand the rulings, it is important for the witness to assert this privilege at a time prior and not necessarily—

The Court: How am I going to make an intelligence [*sic*] guess as to whether he is claiming it rightfully or wrongly?

Mr. Rothwax: Your Honor, anythink that would associate him with that piece of evidence could conceivably, at a later time, and due to circumstances beyond my knowledge or his, embroil him, again conceivably, in some kind of federal prosecution. I have not been present throughout this trial; I have not seen all the minutes in this particular case; I do not know what the thrust of your Honor's questions are; I do not know what the relevancy of the matter is.

en a fraud. The second offered reason for calling Chandler is more intricate. Edelman apparently claimed that a fifth card-burner was not prosecuted because he was beyond draft age, allegedly tending to show either the Government's doubt as to the constitutionality of draft-card prosecutions at least against per-

sons not subject to induction, or discriminatory application of the statute. The Government's explanation for nonindictment was inability to recover part of the burnt card as evidence. Edelman claimed this was a pretext; if called, Chandler could confirm or deny the ease of finding a mutilated card.

The Court: Mr. Edelman testified, in substance, that at the rally that was held on November 6th of last year, in an attempt to burn his draft card he was met with bad success, as they say, and he could not get the card burning as well as he would like to have it burn because it had been laminated, and he tore it in half and then tried again but without success, and in disgust he took it and threw it into the crowd. He said that at a date not too far from that date this gentleman, who was in the audience and who was a friend of his, told him that he had found the card because Mr. Edelman's name was on the handwritten part of it.

Mr. Rothwax: I understand that when this testimony had taken place your Honor addressed a question to Mr. Edelman as to whether or not when Mr. Chandler handed that piece of paper to him Mr. Chandler knew that Mr. Edelman was under indictment. I understand that Mr. Edelbaum [sic] answered yes, he did know.

Aside from that particular question or its answer, it seems to me that that is a factor or circumstance which weighs in the desirability of Mr. Chandler answering this particular question.

\* \* \* \* \* \*

The Court: Mr. Fleming did ask the witness the following:

"Q. I do not imagine Mr. Chandler knew you were [under] indictment, did he? A. Yes, he did."

What time that refers to I have no idea.

Mr. Rothwax: It occurs to me that if that was the case, as Mr. Edelman described it, this might again be a basis whereby an answer, responsive to your Honor's question, might tend to incriminate Mr. Chandler, so it is on that basis that I ask that he not answer the question.

By the Court:

Q. Were you present at the rally that was held in Union Square on November 6, 1965, as part of the audience? A. I would request permission to speak to counsel.

\* \* \* \* \* \*

(The witness conferred with his counsel.)

\* \* \* \* \* \*

Q. What is your answer? A. I respectfully refuse to answer the question on the ground that it might tend to incriminate me.

The Court: I cannot follow why that would tend to incriminate him being present with 2,000 other people.

Mr. Rothwax: Again, your Honor, as I read the law—and I may be in error—it seems to me that if he is to assert the privilege he is to assert it the first time, the earliest moment when he deems that the answers to those questions may lead into a chain of circumstances, to a possible incriminating circumstance.

The Court: I think we can test it on that.

By the Court:

Q. That's your answer, that you refuse to answer the question whether or no you were present at Union Square on November 6, 1965, during the rally when some five men publicly burned their draft cards, and you say you refuse to answer the question on the ground that it might tend to incriminate you? A. Yes, sir.

The Court: I direct the witness to answer, and you advise him not to?

Mr. Rothwax: I do, your Honor.

The Court: I think, perhaps, the better way to do it is to hold him in contempt for failing to answer that question.

You may step down. Thank you.

A contempt hearing was held on November 3, 1966; Chandler's counsel then made quite clear, if it had not been so before, that appellant's refusal to answer had been due solely to counsel's advice. Based upon the above quoted record, Judge Murphy held Chandler in contempt of court. On December 8, 1966, with the

benefit of a presentence report showing that the defendant was "a man of integrity and intelligence and a real citizen," the judge suspended imposition of sentence, and placed Chandler on probation for a period of one day.

Appellant asserts that the judgment of conviction should be set aside because (1) the privilege against self-incrimination was properly invoked; and (2), in any event, he was never directly ordered to answer after he invoked the privilege.

 The substantive attack on the judgment of conviction is persuasive. The applicable law has been unequivocally stated by the Supreme Court. In Hoffman v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), the Court said:

> The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. *(Patricia) Blau v. United States,* 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason v. United States,* 244 U. S.362, 365, 37 S.Ct. 621, 61 L.Ed. 1198 (1917), and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself— his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), and to require him to answer if "it clearly appears to the court that he is mistaken." *Temple v. Commonwealth,* 75 Va. 892, 899 (1881). However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which

a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

The Court emphasized (341 U.S. at 488, 71 S.Ct. at 819) that the criterion is whether it is

> "*perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency" to incriminate. [Emphasis in original.]

This is a test that treats the privilege with solicitude; it has again been repeated in the last few years. See Malloy v. Hogan, 378 U.S. 1, 11–12, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Whether an answer "would furnish a link in the chain of evidence needed to prosecute" has also been liberally construed. In Simpson v. United States, 355 U.S. 7, 78 S.Ct. 14, 2 L.Ed.2d 22 (1957),[2] the Supreme Court reversed *per curiam* and without discussion three findings of contempt for refusal to answer questions innocuous on their face. There have been other similar summary reversals by the Court of a conviction for contempt, e. g., Trock v. United States, 351 U.S. 976, 76 S.Ct. 1048, 100 L.Ed. 1493 (1956). And in Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957), reversal on this issue was apparently avoided only by a Government concession in the Supreme Court that a sufficient showing of tendency to incriminate had been made by petitioner. Moreover, it is now clear that the privilege extends to protection against prosecution for state crimes, as well as federal. Murphy v. Waterfront Commission, 378 U.S. 52, 77–

2. Reversing *per curiam* 241 F.2d 222 (9th Cir.), Wollam v. United States, 244 F.2d 212 (9th Cir.), and MacKenzie v. United States, 244 F.2d 712 (9th Cir.).

78, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Finally, the most recent decisions of the Court illustrate "the tradition of the broad protection given the privilege." Spevack v. Klein, 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967); see Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 636, 17 L.Ed.2d 562 (1967); Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965); Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

■ We turn now to apply these principles to the facts before us. Judge Murphy at the outset made clear to Chandler what he wanted to find out. The judge told appellant:

What I wanted to ask you about were the circumstances under which you received or found this half of the draft card which has been marked as Exhibit AE . . . .

According to Edelman, Chandler had been in possession of a key piece of evidence in a federal prosecution for almost a year. He had kept it "in a safe place," knowing of the indictment and pending trial of Edelman. If Chandler were to admit to that, could it reasonably be said that "In this setting it was * * * 'perfectly clear * * * that the [admission] cannot possibly have such tendency' to incriminate"? We conclude that the answer is no. Chandler "could reasonably have sensed the peril of prosecution for federal offenses ranging from obstruction to conspiracy." See Hoffman, supra, 341 U.S. at 488, 71 S.Ct. at 819. Indeed, Chandler's attorney specifically mentioned both of these possibilities and others to Judge Murphy.[3] E. g., 18 U.S.C. § 3, which provides:

Accessory after the fact

Whoever, knowing that an offense against the United States has been committed, * * * assists the offender in order to hinder or prevent

his apprehension, trial or punishment is an accessory after the fact.

and 18 U.S.C. § 4, which provides:

Misprision of felony

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.

The Government argues that under these statutes "possession of the remnant could have been criminal only if Chandler thereby affirmatively intended to protect Edelman from prosecution"; since Edelman disavowed such intent in Chandler, there was no danger to Chandler. However, whatever may be the fact as to Chandler's intent—and we see no reason to disagree with Edelman's characterization thereof—the issue is not whether Chandler's motive was known to him to be pure; rather it is whether the Government would necessarily agree and hence whether Chandler could "reasonably have sensed the peril of prosecution." We conclude that he could have. "[A] witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." Slochower v. Board of Higher Education, 350 U S. 551, 557–558, 76 S.Ct. 637, 641, 100 L.Ed. 692 (1956).

The Government also points out that the specific question which led to the contempt finding asked only whether Chandler was present at the rally. This is indeed so; after stating that he wanted to ask about "the circumstances" under which Chandler received the draft card, the judge did take a step or two back. But in view of the announced purpose of the questioning, we cannot say that an admission of presence at the

---

3. In addition to the colloquy quoted above, Chandler's attorney referred to other statutes at the contempt hearing on November 3.

rally could not possibly be a link in the chain of evidence in the broader inquiry, whose incriminatory implications we have already discussed. Moreover, Chandler's counsel—called in to defend him on short notice and not familiar with the transcript of the Edelman trial—may not have acted with an excess of caution even if the limited question to Chandler be considered alone.[4] Some eleven months before Chandler was called to testify, a New York state judge apparently impliedly held that the rally Chandler attended was an unlawful assembly since draft cards were burned.[5] However unenthusiastic one may be about such a decision, it hardly supports the Government claim made here that appellant "chose blind refuge within the Fifth Amendment." It is true that this particular possibility of criminal liability was not called to the judge's attention by Chandler's attorney, although others were.[6] But it surely indicates that the general concern of Chandler's counsel was not misplaced.

 The Government, citing Murphy v. Waterfront Commission, 378 U.S. at 79, 84 S.Ct. at 1609, also tells us to "remember that * * * incrimination cannot result from an answer given in response to a Court's direction. Such an answer is involuntary—indeed it is coerced—and therefore never can be used against the declarant." But the portion of the opinion cited dealt with the problems of adjustment in federal-state relationships when incriminating testimony is compelled under a state immunity statute.[7] No such statute, state or federal, is invoked here, and no suggestion of possible immunity was even hinted at in questioning the witness. Cf. Stevens v. Marks, 383 U.S. 234, 86 S.Ct. 788, 15 L.Ed.2d 724 (1966). Moreover, absent a grant of immunity, restricted treatment of a coerced disclosure, see United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16

---

4. The contention made by ardent investigators and counsel, and considerably upheld by judges, is that one thing necessarily leads to another, and that a witness who permits himself to be enticed into opening a topic must follow it through to the bitter end. Fear that a client may find himself committed to a greased slope causes lawyers to recommend stoppage well back on level ground, and clients to follow the recommendation.

 J. Maguire, Evidence of Guilt § 2.05 at 42 (1959).

5. Any person at an unlawful assembly "participating therein by his presence * * * is guilty of a misdemeanor." N.Y.Penal Law, McKinney's Consol.Laws, c. 40, § 2092. In People v. Carroll, Docket Nos. C-20860, C-20861, N.Y.City Crim. Ct., N.Y.County, defendant Carroll was acquitted of charges of disorderly conduct (N.Y.Penal Law § 722(2)) and, significantly for the issue here, of disturbing a lawful assembly (N.Y.Penal Law § 1470), apparently on the ground that the assembly was not lawful. Carroll had squirted a fire extinguisher at persons at the November 1965 rally. See N.Y. Times, Nov. 30, 1965, p. 5, col. 6; id. Nov. 7, 1965, p. 1, col. 3.

6. In addition to the examples of possibly applicable criminal statutes already given, Chandler's attorney referred to 50 U.S.

C.App. § 462(b) (5) and 18 U.S.C. §§ 371, 484, 499, 1002, 2387, 2388.

7. [W]e hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits.[18] This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.

 18. Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.

L.Ed.2d 510 (1966), is not a substitution of an exclusionary rule for the right to remain silent; rather it is an effort to limit the effect of prior wrongfully compelled testimony. ' See Mansfield, The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information, in 1966 Supreme Court Review 103, 162. To argue, therefore, that refusal to answer under an erroneous order is contemptuous puts the cart before the horse. Indeed, if this reasoning were controlling, the privilege to remain silent need never be observed.

Finally, the Government urges that we should not encourage conjured fears of incrimination or arbitrary refusals to answer, of which United States v. Pace, 371 F.2d 810 (2d Cir. 1967), is an example. But this is hardly such an instance. In this case, appellant answered questions asking his residence, his profession and whether he knew Edelman; Chandler balked only when the queries zeroed in on the rally. In view of the judge's opening statement of purpose, the facts already discussed, and the broadly protective test to be applied, we hold that appellant's invocation of the privilege was proper.

■ Appellant's second point is that there was no adequate basis for a finding of contempt under the test of Brown v. United States, 359 U.S. 41, 50, 79 S.Ct. 539, 546, 3 L.Ed.2d 609 (1959): [8]

Even after an adverse ruling upon his claim of privilege, the petitioner was still guilty of no contempt. It was incumbent upon the court unequivocally to order the petitioner to answer. Cf. Wong Gim Ying v. United States, 98 U.S.App.D.C. 23, 231 F.2d 776.

Chandler claims that on the record quoted above, we can imply no order to him to answer any question, at least not an unequivocal one. We need not agree with Chandler to be reminded how easily this sort of claim of error can be obviated. Upon invocation of the privilege and the court's determination that a witness should answer, the court should (1) warn the witness of the possibility of contempt, (2) in the clearest terms direct the witness (not merely through a statement to his attorney) to answer, and (3) see that the record clearly reflects that the witness persists in his refusal to respond. However, in view of our holding that Chandler properly invoked the privilege, we need not decide this issue.

Reversed, with direction to enter judgment of acquittal.

---

8. *Brown* was overruled on other grounds in Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965).