UNITED STATES of America,
Appellee,

v.

Alberto LLANES, Defendant-Appellant.

No. 323, Docket 31897.

United States Court of Appeals
Second Circuit.

Argued Feb. 8, 1968.

Decided July 29, 1968.

Jay Gold, Pierre N. Leval, Asst. U. S. Attys., Robert M. Morgenthau, U. S. Atty., for appellee.

Murray M. Segal, New York City, for appellant.

Before WATERMAN and FEINBERG, Circuit Judges, and BARTELS, District Judge.*

WATERMAN, Circuit Judge:

Appellant was convicted in the United States District Court for the Southern District of New York, after trial before Cannella, J., and a jury, of receiving, concealing and facilitating the transportation and concealment of approximately twenty one grams of illegally imported heroin, knowing the drug to have been illegally imported, in violation of 21 U.S. C. §§ 173, 174. The case of a codefendant, Pino, charged in another count of the same indictment with a related violation of these sections, was ordered severed before appellant's trial began. Though Pino was called as a witness at the Llanes trial he has yet to be tried, being presently a fugitive. Appellant received the mandatory minimum sentence of five years imprisonment, and he appeals the conviction. We affirm.

This is a rather typical narcotics case, in that the twenty one grams of heroin were seized from appellant's person after he had been searched, not pursuant to a warrant, as an incident of his warrantless arrest. The major question raised by appellant, as might be expected, is whether the federal narcotics agents had probable cause for the warrantless arrest.

In admitting the heroin as evidence at the trial the court relied upon determinations made by Judge Palmieri in a prior separate suppression hearing that the narcotics agents did have probable cause to arrest appellant and Pino, that the searches incident to those arrests were proper, and the ultimate seizures of the narcotics found during those searches were justified. The evidence was that in May, 1965, upon an informer's tip, narcotics agents Thomas and Gruden commenced a surveillance of a street intersection in Manhattan, and over a period of two months they observed Pino receiving money from known addicts and drug peddlers. At about the same time the agents learned from other sources that appellant Llanes was an addict and small-time peddler in the same neighborhood. On August 11, 1965, at 11 p.m., the agents observed Llanes and Pino enter a taxicab. The agents followed the cab until Pino and Llanes alighted at an apartment building in the Bronx. Thomas followed them and observed them entering the rear ground floor apartment. Thomas then stationed himself in the hallway near the apartment door, which, though locked, was hanging imperfectly, leaving a small opening, and listened to the conversations of those inside the apartment. His task was made simpler by the fact that the occupants of the apartment were speaking so loudly that their voices were clearly audible in the hallway. Thomas heard Pino, whose voice he had heard before and therefore could identify, conversing with another person about the "business," and how things were getting "hot" for Pino so that the person to whom he was speaking would

* Of the Eastern District of New York, sitting by designation.

have to take over the business. The two also talked about the quality of a recent supply of heroin. Pino further noted that they had to make "a delivery at one a. m.," and he instructed the person to whom he was speaking to "Hurry up back with the money." Also Pino addressed his companion as "Alberto," which is Llanes's first name. Meanwhile, Agent Gruden perched himself on the railing of the steps leading from a nearby side door to a rear yard. From there he peered into the rear apartment's bathroom through a partially opened window and he reported to Agent Thomas that he had seen Pino in the bathroom placing quantities of white powder into glassine envelopes. Later, at approximately one o'clock a.m., the apartment door was opened and Llanes stood at the threshold. The agents stepped forward, identified themselves as narcotics agents, and arrested both Pino and appellant.

 Whether a warrantless arrest is constitutionally valid depends upon "whether, at the moment the arrest was made, the officers had probable cause to make it." Beck v. State of Ohio, 379 U. S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Moreover, federal narcotics agents are authorized to make warrantless arrests whenever they have "reasonable grounds to believe that the person to be arrested has committed or is committing" a violation of a law of the United States relating to narcotics. 26 U.S.C. § 7607(2). The Supreme Court has said that "probable cause" as used in the Fourth Amendment and "reasonable grounds" as used in 26 U.S.C. § 7607(2) mean substantially the same thing. Wong Sun v. United States, 311 U.S. 471, 478 n. 6, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963); Draper v. United States, 358 U.S. 307, 310 n. 3, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Officers are said to have "probable cause" to arrest if at the moment of arrest "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the subject of the arrest] had committed or was committing an offense." Beck v. State of Ohio, supra at 91, 85 S.Ct. at 225. In the instant case appellant states that the agents may have had probable cause to arrest Pino because they recognized his voice and were certain that he was in the apartment at all relevant times. Nevertheless, appellant contends that because the agents did not know his voice they did not have probable cause to arrest him. This argument misses the mark. In order for an agent to have probable cause to arrest he need not know the identity of the person being arrested. He need only know enough to support a prudent man's belief that an offense is being committed by the person, known or unknown, whom he is arresting. The agents here knew that someone, presumably appellant, was in the apartment with Pino. They overheard a conversation between the people in the apartment about the narcotics trade. They had seen white powder being placed in glassine envelopes. They had heard Pino direct someone else to make a delivery at one o'clock. They knew the only means of egress from the apartment was the hallway door, and they kept that door constantly under surveillance. When the door was opened at approximately one o'clock it was reasonable to assume that the person leaving the apartment was the person who had been instructed to make a delivery at one o'clock and that the person, whoever he might be, would have concealed narcotics on his person and thus, in all probability, would be committing a federal crime. At this point a prudent man would be justified in believing a violation of the narcotics law was being committed by the person leaving the apartment. Compare United States v. Beigel, 370 F.2d 751 (2 Cir. 1967), United ed States v. Devenere, 332 F.2d 160 (2 Cir. 1964).

 In a related assignment of error, appellant contends that agent Thomas, in stationing himself in the hallway and eavesdropping upon appellant's conversation with Pino, violated appellant's

Fourth Amendment right to privacy, citing Katz v. United States, 389 U.S. 347, 88 S.Ct. 507 (1967); therefore, he argues, the testimony regarding the unconstitutionally overheard conversations should not have been admitted at the suppression hearing, and, without this testimony, "probable cause" could not have been established. However, appellant overlooks an important qualification placed upon the constitutional protection outlined in *Katz,* supra, which was an electronic eavesdrop case. In noting that the "Fourth Amendment protects people, not places," Justice Stewart, writing for the majority, also observed that "What a person knowingly exposes to the public, *even in his own home* or office, is not a subject of Fourth Amendment protection." 389 U.S. at 351, 88 S.Ct. at 511 (emphasis supplied). We believe that conversations carried on in a tone of voice quite audible to a person standing outside the home are conversations knowingly exposed to the public. Compare the statement in the majority opinion in Hoffa v. United States, 385 U.S. 293, 303, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), quoting from the dissenting opinion of Mr. Justice Brennan in Lopez v. United States, 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963): " 'The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.' " In the same dissent Mr. Justice Brennan observed that eavesdropping and disguise "do not so seriously intrude upon the right of privacy" as does electronic eavesdropping, and that the "risk" referred to above changes crucially "as soon as electronic surveillance comes into play." 373 U.S. at 465–466, 83 S. Ct. at 1402. In contrast to conventional eavesdropping, he noted, "there is no security from that kind of [electronic] eavesdropping, *no way of mitigating the risk,* and so not even a residuum of true privacy." Id. at 466, 83 S.Ct. at 1402.

(emphasis supplied). Thus appellant's reliance upon *Katz* is misplaced and we hold that appellant's Fourth Amendment rights were not invaded.

■ Appellant contends that the arresting officers did not sufficiently identify themselves at the moment of arrest, compare Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). This contention is being raised for the first time on appeal, and Agent Thomas's testimony at both the suppression hearing and the trial supports the conclusion that appellant had been adequately apprised of the agents' identities and mission.

■ It is also contended that the trial court's refusal to charge the jury on entrapment was error. Appellant was not entitled to such a charge because no evidence was presented from which an entrapment could be inferred. The fact that Pino, who was called as a witness by appellant, might have given evidence from which entrapment could be inferred, if he had not relied upon his Fifth Amendment privilege to refuse to answer defense counsel's questions, does not lead us to reach a different result; such speculation is no substitute for evidence in the record and the judge was not required to charge on the issue. See, e.g., United States v. Bishop, 367 F.2d 806 (2 Cir. 1966).

■ Alternatively, appellant argues that the reason for the lack of evidence of entrapment is that Pino was allowed to invoke his privilege against compelled self-incrimination to an improper extent. We disagree. It is true that, the judge first having excluded the jury, Pino "took the Fifth" in response to every question propounded by defense counsel. However, it is to be remembered that Pino was himself under indictment for a narcotics violation which allegedly occurred at the same time and place as appellant's alleged violation, and, indeed, in the presence of the appellant. This then seems to be a classical situation for the full exercise of the privilege. As the Court said in Hoff-

man v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951):

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (Patricia) Blau v. United States, 1950, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170. But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. Mason v. United States, 1917, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198, and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, [95 L.Ed. 344] and to require him to answer if 'it clearly appears to the court that he is mistaken.' Temple v. Commonwealth, 1880, 75 Va. 892, 899.

\* \* \* \* \* \*

"The trial judge in appraising the claim 'must be governed as much by his personal perception of the perculiarities of the case as by the facts actually in evidence.' See Taft, J., in Ex parte Irvine, C. C. S. D. Ohio, 1896, 74 F. 954, 960."

And see United States v. Chandler, 380 F.2d 993 (2 Cir. 1967). We cannot say that it should have been perfectly clear to the trial judge that the answers sought could not possibly have a tendency to incriminate Pino, especially where Pino was already under indictment for a crime arising out of the same incidents involved here. An answer to any of the questions propounded might have opened a line of inquiry which would eventually furnish a link in the chain of evidence to be developed in the impending prosecution of Pino. Compare United States v. Chandler, supra, at 997–1000.

 In view of the statutory presumption under 21 U.S.C. § 174, appellant's final contention that there is insufficient credible evidence to support his conviction is also without merit.

Conviction affirmed.