695 A.2d 588

**Philip Stephen MALPAS**

v.

**STATE of Maryland.**

**No. 1016, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

June 25, 1997.

72

Margaret L. Lanier, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Jerry F. Barnes, State's Atty. for Carroll County, Westminster, on the brief), for Appellee.

Submitted before MURPHY, C.J., and DAVIS and SONNER, JJ.

MURPHY, Chief Judge.

There are three key players involved in every [criminal] trial: the judge, the prosecutor, and the defendant (directly or through his agent, the defense attorney). In terms of the Machiavellian employment of the mistrial device deliberately to sabotage a trial perceived to be going badly for the

prosecution, the historic culprits were the judge and the prosecuting attorney. When, therefore, a mistrial is declared, over the objection of the defense, either at the request of the prosecution or *sua sponte* by the judge, the rule provides that no mistrial will be permitted unless there was a "manifest necessity" for the mistrial.

*Fields v. State,* 96 Md.App. 722, 733, 626 A.2d 1037 (1993).

 In this interlocutory appeal from the Circuit Court for Carroll County, we must determine whether manifest necessity existed for the trial judge's decision to grant the State's motion for a mistrial on the ground that defense counsel presented the jurors with inadmissible evidence. Philip Stephan Malpas, appellant, presents a single question for our review:

Did the circuit court err in denying appellant's motion to dismiss on double jeopardy grounds, when the mistrial that aborted appellant's earlier trial was granted over defense objection and without substantial justification?

Because there was no manifest necessity in this case, we reverse the circuit court's denial of appellant's motion for dismissal of charges.

### Factual Background

In July and August of 1995 Barbara Van Rossum owned a house that contained two dwelling units, one of which she shared with appellant. Richard Scott Craigie, the victim in this case, resided in the adjacent unit. During the month of July, Craigie fell behind on his rent and utilities payments. On several occasions, appellant threatened to remove Craigie's property from the house unless Craigie paid what was owed to Van Rossum. Craigie ultimately vacated the premises after signing an agreement to leave behind his family's dinette set as security for the money he owed.

On August 8, 1995, after he left work, Craigie went to a bar, and eventually met Mrs. Craigie, who was upset that their dinette set was in Van Rossum's possession. At this point, Craigie went to Van Rossum's to retrieve the dinette set, but

was met by appellant, who threatened to "kick [Craigie's] ass" unless Craigie left the property. Craigie insisted on removing the rest of his possessions, picked up a shovel off the ground, and headed toward the house. Appellant then pulled out a gun and threatened to kill Craigie if he did not leave the property. Craigie testified that although he then dropped the shovel, raised his left hand, and told appellant he would leave, appellant shot him in the side as he turned away.

Appellant was charged with attempted first-degree murder, assault with intent to murder, reckless endangerment, assault, battery, and the use of a handgun in the commission of a crime of violence. A jury trial commenced on March 4, 1996, but was terminated three days later over appellant's objection when the court "very reluctantly" granted the State's motion for mistrial. Appellant then moved for dismissal of all charges on double jeopardy grounds. That motion was denied, but further proceedings were stayed pending appeal.

### The Basis for the State's Motion

The following exchange occurred during Craigie's cross-examination:

[COUNSEL]: And you described [appellant] as ... calling you a mother-fucker several times in the course of these events on the 8th when he's coming after you?

[CRAIGIE]: Yes, sir.

 \* \* \* \* \* \*

[COUNSEL]: That's a term you use very frequently, isn't it?

 \* \* \* \* \* \*

[CRAIGIE]: Towards?

[COUNSEL]: Towards other people?

[CRAIGIE]: No.

 \* \* \* \* \* \*

[COUNSEL]: Well, you said your wife had left and you hadn't seen her in three or four weeks ... And there were

times when you had some really violent arguments there, weren't there?

[CRAIGIE]: No, sir, me and my wife never . . .

[COUNSEL]: Never did?

[CRAIGIE]: No. sir. No, not at all.

[COUNSEL]: Did you refer to her brother as a mother-fucker?

[CRAIGIE]: My—her brother?

[COUNSEL]: Uh-huh.

[CRAIGIE]: . . . I'm sure I did after he set there and stopped payment on a three hundred dollar rent check that I had to cover.

\* \* \* \* \* \*

[COUNSEL]: But you and your wife had arguments about her boyfriend?

[CRAIGIE]: My wife never had a boyfriend. I don't know anything about that.

[COUNSEL]: You don't—you don't recall calling her up on July 24th, 1995, around 7:25 in the evening and referring to her boyfriend as that skinny-ass little mother fucker?

[CRAIGIE]: No. My wife—my wife . . .

[COUNSEL]: You never did that?

[CRAIGIE]: No. sir. No, sir, not at all.

[COUNSEL]: And you never—never referred to her brother as that fat-ass mother-fucker?

[CRAIGIE]: He—he wasn't fat, he was a big boy. He wasn't fat, he was muscular.

[COUNSEL]: Did you—did you tell her that if anyone came to the house and as soon as they got on the porch you were gonna shoot them?

[CRAIGIE]: My wife? . . . No, I would never threaten my wife.

[COUNSEL]: And did you quite often use this term with her, mother-fucker?

\* \* \* \* \* \*

[CRAIGIE]: No. I would not—I don't—I have respect for my wife, I would have never done that to her, no.

[COUNSEL]: I'd like you to listen to something, Mr. Craigie.

Appellant had used a micro-cassette recorder to record Craigie's voice during a telephone conversation in which Craigie was yelling so loud that he could be heard in appellant's unit.[1] At this point in the proceedings, appellant's counsel proceeded to play a tape of that conversation, presenting the jurors with the following utterances shouted by Craigie:

[CRAIGIE]: ... You need to wake the fuck up. I don't give a shit what anybody does. I do not like bein' threatened. The worst thing in my life somebody could ever do to me is threaten me. (Unintelligible.)

I tell you what, you need to call. Tell that asshole hole [sic]—that—that fat mother-fucker to call me. Tell him to call me. That's all you to do.

Tell that little skinny-ass mother-fuckin' boyfriend of yours to call me. Tell him to call me.... [T]he first mother-fucker that walks up on this porch, I'm gonna shoot 'em. I'm gonna. I am. I am.

The State interposed no objection to the presentation of that evidence. The following transpired when appellant's counsel resumed cross-examination:

[COUNSEL]: Did you hear that? If they come up on the porch, if someone comes up on the porch, the first person

---

1. When questioned by the court about how he obtained the tape, defense counsel made the following proffer:

We're gonna show evidence that this is Mr. Craigie yelling so loudly that [appellant and Van Rossum] just simply turned on a tape recorder in the apartment and recorded it. As [the prosecutor] said, there's nothing wrong with that.

* * * * *

All right, I proffered to the Court today at the bench a few minutes ago that this man was so loud that these people simply turned on a tape recorder in their home and they recorded him. Now, I don't know what other kind of proffer I can make.

that comes up on the porch, "I'm gonna shoot 'em"? Did you say that?

[CRAIGIE]: I guess that's what it's saying, yes.

\* \* \* \* \* \*

[COUNSEL]: Okay. Now, during the period of July down to August 8th, did you threaten Barbara Van Rossum?

[CRAIGIE]: No, sir, I never did.

\* \* \* \* \* \*

[COUNSEL]: Did you tell Philip Malpas you were gonna kill him?

[CRAIGIE]: I told him I could have killed him.

[COUNSEL]: You told him you could have killed him?

[CRAIGIE]: Yes.

[COUNSEL]: When did you tell him that?

[CRAIGIE]: When he walks in—walked in to my house.

At this point, the State objected for the first time and moved for a mistrial on the narrow ground that appellant's counsel had no right to question Craigie about an argument that had occurred in February of 1995.[2] The court denied that motion and testimony continued.

After the luncheon recess, the State once again moved for a mistrial, asserting for the first time that appellant's counsel had no right to play the tape during Craigie's cross-examination. The court denied this motion, ruling as follows:

There was nothing on that tape that directed any kind of threats or foul language or innuendo towards [appellant] or towards Ms. Van Rossum. Why Mr. Malpas felt that he was compelled to tape this conversation of Mr. Craigie while Mr. Craigie was in his house with a reasonable right and expectation of privacy, I don't know.

This may well constitute ... an illegal intercept, I don't know, but that's not what's before me today.

---

2. Prior to trial, the court had granted the State's motion *in limine* to preclude any testimony concerning the February, 1995 incident.

If, prior to your playing that tape, you had disclosed to the Court and to the State what it was that you intended to do, and I'd have heard a proffer at that time and an opportunity to listen to that tape in camera, I would have had an opportunity to make a decision based on what I heard, and whether it was relevant, based on what was said.

And I'm going to caution the Defense ... that that should not happen again, it should not happen again, or the Court will act appropriately. We don't have trial by ambush in— in this State, although we don't require the Defense to disclose impeachment witnesses or other kinds of things. Still, there's some fundamental fairness that I think is being violated in this case.

Now, Mr. Craigie did say he did not use such language directed towards his wife and that he did not utter words directed towards other persons. Well, from what I heard on the tape, that language wasn't directed towards his wife, he did use it conversationally, he did use it towards whoever the skinny-ass guy is and whoever the large guy is, and that directly contradicted what he had said he had not done, or couldn't recall doing. And, it's up to him to explain what he did say and what he didn't say, and he's had an opportunity to do that.

So, I don't believe it amounts—what's happened amounts to a basis for a mistrial .... when that tape was cued up and played during cross-examination, I didn't know what to expect, I don't think the State knew what to expect by what was [being] played.

But, no objection was made, as you say, and I think that what came in is—tests, perhaps, to some extent, subject to redirect, the victim's—alleged victim's credibility, but I don't think that it—it's relevant and will in all likelihood—or whether or not it forms a basis for [appellant], since ... this language was not directed to him or Ms. Van Rossum, serves as a basis for concern or fear.

So, that being said, I'm going to deny the Motion for Mistrial. . . .

The trial continued. Three days later, however, the State yet again moved for a mistrial, this time in a written motion accompanied by "Mistrial Motion Exhibit 1," a letter from an Assistant Attorney General of Maryland that had been requested by and was addressed to the State's Attorney for Carroll County. The text of that letter is as follows:

You've asked for our views on application of Title 10, subsection 10 of Courts Article, concerning wiretapping and electronic surveillance to a specific set of facts.

As I understand the situation, an individual surreptitiously tape-recorded words spoken by the occupant of an adjoining dwelling unit, the tape recording apparently made by placing the recorder near the thin wall connecting the two units was done without the knowledge or consent of the neighbor.

In my view, such an action would generally be prohibited under 10–402(a)(1) of the Courts Article, which makes it unlawful for any person to wilfully intercept any wire, oral, or electronic communication. An oral communication is defined as 'Any conversation or words spoken to or by any person in a private conversation.' 10–401(ii)(1). If an oral communication has been intercepted, it is unlawful to wilfully disclose its contents. 10–402(a)(2). Furthermore, under 10–405, neither 'the contents of' an intercepted oral communication nor any 'evidence derived' from it 'may be received in evidence in any trial ... or other official proceeding.'

Given that this question relates to a matter currently at trial, this Office cannot provide a formal opinion. However, I hope you will find this statement of my views to be helpful.

After hearing further argument of counsel, the court announced the following ruling:

Now, neither the State, nor the Court had knowledge—or the victim, for that matter—had knowledge of that tape, and the Court had not been asked to rule on the tape's admissibility, or an opportunity to research the law, which has subsequently come to light on the use of such a tape.

The tape was cued up and ready to be played and was, in fact, played.

The Court subsequently denied a State's Motion for Mistrial moments later at the bench, stating reasons on the record. And [the State] renewed that Motion at the end of the State's case; the Court subsequently denied that Motion, as well.

Today, at the start of trial—or shortly before the start of today's proceedings, the State filed a formal Motion for Mistrial.... Accompanying her Motion, she provided a letter—it's a letter/opinion dated March 6th, 1996 addressed to the State's Attorney. It's Mistrial Motion Exhibit 1.

\* \* \* \* \* \*

Now, with her Motion, the ... Deputy State's Attorney provided the Court with the Wood's case.

\* \* \* \* \* \*

Clearly, Mr. Craigie's telephone conversation, while he was alone in his apartment, is a private ... conversation, which qualifies as an oral communication as defined in Section (2) dash (i).

It is also clear that [appellant] intercepted Mr. Craigie's prior—private oral communications by tape recording said conversation. Section (5) makes it equally clear that the Defendant is, quote, "any individual," end quote, which is covered by the statute.

\* \* \* \* \* \*

10–402 makes it unlawful for one to intercept an oral communication and disclose that interception.

Therefore, the Defendant's tape of Mr. Craigie's oral communications is a violation of the statute and could—could be considered a violation of the statute, and his attorneys are prohibited from wilfully disclosing the contents of that tape by Section 10–402.

Pursuant to Section 10–405, any portion of that intercepted oral communication is not admissible in this trial ....

10–405 excludes this tape even though the Defense seeks to only use it for impeachment purposes.

The State suggests that, to allow this tape to be played in court is reversible error, and refers the Court—moves for a Mistrial and refers the Court to In Re: Rachael [Rachel] S., 60 Md.App. 147 [481 A.2d 520 (1984)] case. The Court of Special Appeals held it was reversible error for the lower court to rely on the results of the defendant's polygraph test even though all the parties had stipulated to the result. It appears to the Court that the results of the polygraph and illegal intercept are analogous in that the legislature has made a very strong statement, they are not in any way admissible.

Accordingly, the Court finds that it would be reversible error for the Court to allow this trial to continue and grants, very reluctantly, the State's Motion for Mistrial.

### The Protection Against Double Jeopardy

The Fifth Amendment to the United States Constitution provides that "no person shall twice be put in jeopardy" for the same offense. U.S. Const. amend. V. This prohibition is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 787, 89 S.Ct. 2056, 2058–59, 23 L.Ed.2d 707 (1969). In Maryland, common law principles also "protect an accused against twice being put in jeopardy for the same offense." *Gianiny v. State,* 320 Md. 337, 342, 577 A.2d 795 (1990).

In this case, jeopardy attached when the jury was empaneled and sworn. *Illinois v. Somerville,* 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973); *Blondes v. State,* 273 Md. 435, 444, 330 A.2d 169 (1975). "[A]fter jeopardy attaches, retrial is barred if a mistrial is declared without the defendant's consent unless there is a showing of 'manifest necessity' to declare the mistrial." *State v. Woodson,* 338 Md. 322, 329, 658 A.2d 272 (1995) (citing *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)). There must be a "high degree of necessity before concluding that a mistrial is

appropriate." *Arizona v. Washington,* 434 U.S. 497, 506, 98 S.Ct. 824, 831, 54 L.Ed.2d 717 (1978).

 Manifest necessity does exist "where there has been a procedural error in the proceedings which would necessitate reversal on appeal." *State v. Crutchfield,* 318 Md. 200, 209, 567 A.2d 449 (1989) (citing *Somerville,* 410 U.S. at 464, 93 S.Ct. at 1070), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1926, 109 L.Ed.2d 289 (1990). In this case, however, there are three reasons why a mistrial should not have been declared as a result of the alleged error. First, the evidence at issue was introduced by appellant's trial counsel rather than by the State. Second, the State made no effort to exclude that evidence at any time before it was presented. Third, evidence of what Craigie shouted so loudly as to be recorded in an adjoining apartment did not violate the Maryland Wiretap Act. As Judge Moylan stated in *Fields,* supra, 96 Md.App. at 745, 626 A.2d 1037:

> [F]rom the vantage point of the defendant ... there are several valuable but quite distinct interests at stake. The foremost is the interest in receiving a fair trial ...
>
> The second interest is in keeping together a tribunal, once it is impaneled, until a verdict has been reached.... There is a significant defense interest in keeping the trial upon the tracks quite apart from the interest in receiving a fair trial.

Appellant was entitled to "keep the trial on the tracks."

## The Alleged Wiretap Act Violation

The Maryland Wiretap Act is codified in Sections 10–401 through 10–414 of the Courts and Judicial Proceedings Article. Under that statute, it is unlawful for any person to:

> (1) Wilfully intercept, endeavor to intercept, or procure any other person to intercept, any wire, oral, or electronic communication;
>
> (2) Wilfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication in violation of this subtitle; or

(3) Wilfully use, or endeavor to use, the contents of any wire, oral, or electronic communication in violation of this subtitle.

Md.Code Ann., Cts. & Jud. Proc. § 10–402(a) (1995 Repl.Vol.).

Section 10–401(2)(i) defines an "oral communication" as "any conversation or words spoken to or by any person in private conversation." Furthermore, Section 10–405 provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of this State, or a political subdivision thereof if the disclosure of the information would be in violation of this subtitle.

Section 10–405 contains an absolute prohibition against the use of illegally obtained wire or oral communications as either substantive or impeachment evidence. *Wood v. State*, 290 Md. 579, 584, 431 A.2d 93 (1981).[3]

In *Fearnow v. C & P Telephone Co.*, 342 Md. 363, 676 A.2d 65 (1996), the Court of Appeals stated that "when an oral communication is intercepted, determining whether a violation of the Wiretap Act occurred hinges on a jury determination that at least one of the parties had a reasonable expectation of privacy." *Id.* at 376, 676 A.2d 65. *See also Benford v. American Broadcasting Co., Inc.*, 649 F.Supp. 9, 11 (D.Md. 1986) (noting that, similar to the federal act, § 10–401(2) of the Maryland Wiretap Act requires factual examination into the person's reasonable expectation of privacy).

■ Appellant contends that the use of the tape recorded statement to impeach Craigie's testimony is not a violation of the Wiretap Act because appellant did not record an "oral communication" as that term is defined in the statute. According to appellant, when Craigie was in his apartment and

---

**3.** It was this opinion that the circuit court referred to as "the Wood's case."

decided to shout loud enough to be heard thorough the walls, he had no reasonable expectation that the content of his conversation was private. We agree. The mere recording of the words that Craigie shouted did not constitute an illegal intercept of "words·spoken to or by any person in *private* conversation." (Emphasis added).

 To determine whether Craigie had a reasonable expectation of privacy in the statements overheard and recorded in a different dwelling unit, we apply the two-pronged inquiry applicable to search and seizure cases set forth in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J. concurring). We first ask whether Craigie exhibited an actual, subjective expectation of privacy with regard to his statements. If we answer that question in the affirmative, we then ask whether that expectation is "one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516.

 It is obvious that "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351, 88 S.Ct. at 511. Craigie could have no expectation of privacy in statements made in his apartment that were shouted so loudly as to be overheard by persons in the adjacent apartment. We do recognize that the "very fact that a person is in his own home raises a reasonable inference that he intends to have privacy, and if that inference is borne out by his actions, society is prepared to recognize his privacy." *United States v. Taborda*, 635 F.2d 131, 138 (2d Cir.1980). In this case, however, what Craigie chose to shout could not have been intended as words spoken in private.

 It is widely recognized that technologically unaided or unenhanced overhearing of statements does not constitute a search under the Fourth Amendment. *See United States v. Mankani*, 738 F.2d 538 (2d Cir.1984); *United States v. Fisch*, 474 F.2d 1071 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973); *United States v. Ortega*, 471 F.2d 1350 (2d Cir.1972), *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36

L.Ed.2d 409 (1973); *United States v. Llanes,* 398 F.2d 880 (2d Cir.1968), *cert. denied,* 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969). The risk of being overheard by an eavesdropper has long been recognized by courts, *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *United States v. Martin,* 509 F.2d 1211 (9th Cir.), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975), and "is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Hoffa v. United States,* 385 U.S. 293, 303, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966), *reh'g. denied,* 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967) (quoting *Lopez v. United States,* 373 U.S. 427, 465–66, 83 S.Ct. 1381, 1401–02, 10 L.Ed.2d 462, *reh'g. denied,* 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963) (Brennan, J. dissenting)).

In *United States v. Agapito,* 620 F.2d 324 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), Drug Enforcement Administration (DEA) agents received information that suspects were selling drugs out of a Manhattan hotel room. Relying on that information, two DEA agents checked into a room adjacent to the one where the drug activity was allegedly taking place. Over the course of two days, by pressing their ears up against the connecting door between the rooms, the agents were able to hear various conversations and noises from the suspects' room. The suspects were ultimately arrested, charged, and convicted of drug trafficking offenses. On appeal, they asserted that, by pressing up against the connecting door, the DEA agents violated their Fourth Amendment rights.

In holding that this activity did not violate the Fourth Amendment, the United States Court of Appeals for the Second Circuit focused on the legal right of the eavesdropper to be in the adjoining or adjacent area, and the reduced privacy afforded by an apartment, hotel or motel when compared with a private residence. In this case, it is equally clear that Craigie did not enjoy a reasonable expectation of privacy as to the words he shouted out in his apartment.

First, appellant needed only his unaided ear to decipher what Craigie was shouting. While the record does not contain an explanation of what prompted appellant to record Craigie's conversation, there is no evidence that appellant ever used an amplifier or sensory enhancing device along with the tape recorder. The fact is appellant merely turned on a tape recorder to capture Craigie's shouting of words that could easily be heard in appellant's apartment.

Second, there is no dispute that appellant was lawfully in position to overhear Craigie's statements. Appellant lived in the adjoining unit with Barbara Van Rossum, the owner of the building, and was as entitled to be in her apartment as Craigie was entitled to be in his. Finally, appellant's presence in the apartment adjacent to Craigie's could reasonably be anticipated.

Apartments are similar to motels and hotels in that both have shared corridors, stairs, sidewalks and common walls. Statements in one apartment made in a tone of voice so loud as to be audible to persons in adjacent apartments are the functional equivalent of statements knowingly exposed to the public. *See Llanes,* 398 F.2d at 884. Thus, Craigie did not enjoy a reasonable expectation of privacy with respect to the conversation played for the jury by appellant's trial counsel, and appellant did not introduce evidence of an "oral communication" in violation of the Wiretap Act.

### Conclusion

As the defense did not present the jurors with illegally obtained evidence, the State should not have moved for a mistrial, and the trial court erred in granting that motion. Moreover, even if the tape was inadmissible, we would be required to reverse on the ground that the State's remedy was exclusion of the inadmissible evidence rather than a mistrial. Md. Rule 4–323. The State did not object when counsel played the tape, objected later on the specific ground that the introduction of such evidence violated the court's prior ruling on evidence of the February fight, and raised the issue of the

Wiretap Act only after an extensive break in the proceedings. *See von Lusch v. State*, 279 Md. 255, 263, 368 A.2d 468 (1977) (where one objecting to the admission of evidence volunteers those grounds, "he will be bound by those grounds and will ordinarily be deemed to have waived other grounds not mentioned.") and *Dyce v. State*, 85 Md.App. 193, 582 A.2d 582 (1990) (improper admission of evidence will not be preserved for appellate review unless the party asserting the error objected at the time the evidence was offered or as soon thereafter as the grounds for the objection became apparent).

Having failed to interpose a timely request for appropriate relief, the State was not entitled to a mistrial thereafter. Further prosecution of this case is barred by appellant's protection against double jeopardy.

**JUDGMENT REVERSED; COSTS TO BE PAID BY CARROLL COUNTY.**