661 A.2d 718

**STATE of Maryland**

v.

**Edward T. GORWELL.**

**No. 21, Sept. Term, 1994.**

Court of Appeals of Maryland.

July 19, 1995.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellant.

Henry L. Belsky (Schlachman, Belsky & Weiner, P.A., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, BELL and RAKER, JJ., and JOHN F. McAULIFFE, J. (Retired), Specially Assigned.

JOHN F. McAULIFFE, Judge, Specially Assigned.

During deliberation of the jury in this criminal case, the trial judge dismissed one of the jurors at the insistence of the defendant and then declared a mistrial when the State refused to proceed with eleven jurors. Thereafter, the defendant filed a motion to dismiss, contending that the trial should have continued with eleven jurors notwithstanding the objection of the State; that as a result there was no manifest necessity for the granting of a mistrial; and that double jeopardy principles protected the defendant from retrial. The trial judge granted the defendant's motion. The State appealed, and we granted *certiorari* prior to consideration of the case by the Court of Special Appeals. We now reverse, finding there was a manifest necessity for the declaration of a mistrial.

## I.

The defendant, Edward T. Gorwell, is a Baltimore City police officer. Just prior to 1:00 a.m. on 17 April 1993 he was following a stolen Chrysler automobile on Ellicott Driveway near Gwynns Falls Park. The Chrysler abruptly stopped, and four young men ran from it into the park. The defendant left his police vehicle and followed on foot. Shortly after the chase began, the defendant fired one shot from his 9 mm. pistol. That bullet struck and killed fourteen-year-old Simmont Thomas, one of the young men fleeing from the Chrysler.

After an investigation, Officer Gorwell was charged with the common-law offense of manslaughter. The State contended that the defendant had no justifiable reason to fire his weapon at or in the direction of the decedent. The defendant contended he had heard a shot from the area where he saw two men running, and that he acted in the defense of his person when he fired a shot at the person he believed was shooting at him. A police search of the area failed to produce any weapons, or any bullets or cartridges possibly connected with the incident [1] except the single cartridge ejected from Officer Gorwell's weapon. The officer's shot struck the decedent in the back, just below the right shoulder blade. The decedent's hands were wrapped in plastic bags at the scene, and a subsequent test was negative for the presence of gunpowder residue.

The case received a substantial amount of media attention in Baltimore City, and had racial overtones—the officer was white and the young victim was African American. In a motion for change of venue the defendant alleged that the city's Mayor and State's Attorney had commented that shootings by police in the city were "excessive in number" and that there was "overwhelming citizen polarization for and against the police."

---

1. A large calibre bullet was found near the left-front wheel of the Chrysler automobile, but it was "extremely worn and weathered looking" and apparently could not be connected to this incident.

Trial by jury commenced on 27 July 1993, in the Circuit Court for Baltimore City. Presentation of evidence was concluded on Tuesday, August 3, but, because the trial judge had other trial commitments, instructions and closing arguments were deferred until Thursday, August 5. The case was given to the jury at noon on that day. The jury deliberated for about five and one-half hours before being excused for the day and instructed to return the next morning.

On the morning of Friday, August 6, one juror did not appear at the appointed time. The remaining jurors were instructed not to discuss the case, and a search was undertaken for the missing juror.

About noon, information was received from the sheriff's office that deputies had contacted the missing juror's employer. The employer stated that the juror picked up his paycheck at 7:00 p.m. on the preceding evening and informed his employer that he was required to return to court the following day. His employer described the juror as a good employee but one who had a drinking problem on his own time. Additionally, the juror's wife called the court in response to messages that had been left on her answering machine, and informed the trial judge that her husband had come home from the courthouse on Thursday, announced that he was going to pick up his paycheck, and left. The juror's wife said she had not seen or heard from him since that time.

The judge sequestered the jury until 2:00 p.m. on Friday, when she held another conference with the attorneys. At this point, she announced that the juror had not been found and asked the attorneys to consider proceeding with eleven jurors. The State's Attorney asked the court to send the eleven jurors home after appropriate admonitions, but to defer any decision on whether to proceed with eleven jurors until the missing juror could be found, and the reason for his non-appearance ascertained. The prosecutor suggested that if the juror's reason for not being present was entirely personal and not associated with the case, proceeding with eleven jurors would be acceptable. If, however, it appeared that the juror was not

present "for a reason associated with this case, or some participant in this case, or something along those lines," than a mistrial would be a more appropriate remedy. Defense counsel, after conferring with the defendant, stated he would agree to proceed with eleven jurors. The eleven jurors were sent home at mid-afternoon on Friday, after being told to avoid any media or other reference to the case.

At 3:30 or 4 o'clock that afternoon the missing juror telephoned the judge. The judge arranged for him to be brought to the courthouse and, while waiting for his arrival, recounted to the attorneys what the juror had told her: that three "white guys" had assaulted him when he was cashing his paycheck. Shortly thereafter, the prosecutor informed the judge that "based on just the allegation that the juror has made, it is going to be impossible for us to accept a jury of less than twelve." He added, however, that the State's view might change after the parties had heard from the juror. He said:

> If the allegation goes away to the point that it has totally evaporated, possibly we can rethink our position, but as long as the allegation remains even in any way viable, there is just no way for the public to accept the impression about what is happening here.

When the juror arrived, he was sworn and interrogated in the presence of the court, counsel, and the defendant. The juror testified that after he left court on Thursday he went home. From there he went to his place of employment and picked up his paycheck, after which he stopped by his mother's house and obtained an additional check from her. Then he went to a liquor store on Eastern Avenue where he cashed his checks. He said as he was walking out, counting his money, three white teenagers attacked him, knocked him to the ground, and took his money; that he was initially dazed but then rode around in his car collecting his thoughts; that he ultimately went to another liquor store and with a few dollars he had in his clothes bought a half-pint of liquor, which he consumed; that he sat in his car for the rest of the night and part of Friday morning before returning to his home.

After the juror completed his testimony, the parties again conferred with the trial judge. The prosecutor suggested that the juror be questioned by the court as to whether the juror felt he could continue serving as a juror without being affected by what had happened to him. The prosecutor said that if the juror was convinced he could continue the State would agree that deliberations of the twelve jurors should continue. The trial judge asked the prosecutor why, if the juror was convinced the attack had nothing to do with the case, the State would object to proceeding with only eleven jurors. The prosecutor replied:

> Because, Your Honor, if, in fact, this jury were to come back with a not guilty verdict, I don't see how it would be acceptable to the public or people of the State that criminal action by some people, who the public could view as interested in this case, would change the balance of the case.

Defense counsel objected to the juror being allowed to continue. He said he did not believe the juror's story, and he thought the juror would be biased. He requested that the court excuse the juror and allow the eleven remaining jurors to continue. The trial judge, although stating that "everybody here is quite sensitive to the issue of race if that is an issue to go into this case," strongly disagreed with the position being taken by the prosecutor. The Assistant State's Attorney agreed to again confer with his superiors. The juror was excused until the following Monday morning.

On Monday morning, the juror was again sworn and testified in open court but out of the presence of the other jurors. After the juror again stated his version of the events that caused him to be absent, the court asked the parties to state their positions concerning continued service of the juror. Defense counsel again objected to the juror being allowed to continue. The prosecutor stated he would submit the decision to the discretion of the trial judge. The trial judge determined that the juror had been guilty of serious misconduct and removed him from further service on the jury.

The trial judge, after voicing a strong opinion that deliberations should be allowed to continue with the remaining eleven jurors, again asked the positions of each party. Defense counsel stated that "subject to two *voir dire* questions being asked of the jurors, we are inclined to go ahead with eleven." [2] The prosecutor refused to consent to continuation of the trial with eleven jurors. He said the State was concerned that so much time had elapsed since the conclusion of the evidence, and he was concerned about the public perception of justice under the circumstances. He said:

I must tell the court that, among other things, we are very concerned about the lapse of time here, and the record should reflect that the evidence concluded last Tuesday at three-thirty.

The jury began its deliberations approximately noon time on Thursday, and after four hours, or four and a half hours of actual debate, was stopped Friday, and has spent three days to ponder not the evidence, but to ponder the process and the missing juror. We are concerned that the integrity of the process has been so affected that the perception of justice and the public acceptance of a verdict in this case, which was going to be difficult at best anyway for the general public to accept any verdict here, but given the fact that one of the jurors had to be removed, the State is unable to give its consent to proceeding with eleven jurors.

Defense counsel then suggested another option—that the defendant be permitted to waive his right to trial by jury and that the trial judge decide the case. The prosecutor indicated that this option would be within the discretion of the court, and the following colloquy ensued:

THE COURT: Is the State telling me that they have no opposition to the court being the trier of fact, but they have an opposition to eleven representative people from the community being the trier of fact?

---

**2.** The two questions proposed by defense counsel concerned possible media exposure over the weekend, and whether the jurors would be affected by the failure of one of their number to return.

THE PROSECUTOR: Your Honor, the State has no right to decide whether or not the defendant is tried by the court or the jury. We do have the right to either consent or not consent to a jury of less than twelve. We are taking no position about Your Honor accepting a change of election, primarily because we have no right to take a position, but to answer the court's question very succinctly, we have confidence in the court's ability, in the public's perception of the court's ability to decide the case, a confidence that we do not share with a jury of less than twelve.

The trial judge declined the offer, stating:

[T]his court believes it should not be the trier of fact and the trier of law. I believe that because I do agree with the State that there is, especially in this case, a need for a perception of justice and for the process to work....

The trial judge, after expressing her dismay and disappointment with the State's decision, declared a mistrial.

Thereafter, the defendant filed a motion to dismiss, contending that retrial was barred by double jeopardy protections. At the hearing of that motion, defense counsel argued that jeopardy had attached at the time trial commenced; that the defendant was entitled to have that trial completed by that tribunal; and that "there was no manifest necessity for the State to not accept eleven jurors." The defense asserted that the State did not act in good faith in withholding its consent to proceed with eleven jurors, and that the motivation of prosecutor was that "the State thought they lost this case and wanted to get a new trial." The prosecutor adamantly denied that allegation and said that the State's decision had been made after consultation with a number of persons, including superiors in the State's Attorney's Office and the victim's family. The prosecutor said there were three principal reasons for the State's decision: 1) concern about the time that had elapsed between the close of the evidence on Tuesday and the proposed resumption of deliberations on the following Monday; 2) concern about impact on the remaining jurors of speculation by them concerning the non-appearance of one of their num-

ber; and 3) concern "that in a case which caused such controversy within the community a verdict which sprang from an irregular process would not be perceived as justice."

The trial judge took the motion under advisement and thereafter filed a memorandum opinion and order granting the motion and dismissing the charges. She held that the proper test to be applied was not whether the State acted in bad faith, but "whether there was a reasonable alternative to the declaration of a mistrial." The trial judge found that in this case there was both "prosecutorial manipulation" and a reasonable alternative to a mistrial. The determination of prosecutorial manipulation was based on a finding that "the State's refusal to go forward with less than a broad-based jury of twelve individuals at the conclusion of a long and expensive trial manifested a deliberate intent on its part to afford itself a more favorable opportunity to convict." Concerning the existence of a reasonable alternative to a mistrial, the court held that "a jury of less than twelve was a reasonable alternative, and that the State has not met its burden of proving otherwise."

## II.

Although at one time in the jurisprudential history of this country it was widely believed that the constitutional right to a jury trial guaranteed by the Sixth and Fourteenth Amendments included the right to insist upon a jury of twelve persons, the Supreme Court has declared that not to be the case. In *Williams v. Florida*, 399 U.S. 78, 86, 90, 90 S.Ct. 1893, 1898, 1900, 26 L.Ed.2d 446 (1970), the Court opined that the fixing of the number of jurors at twelve "appears to have been a historical accident," and that this feature of the jury had not been immutably codified into the Constitution.[3] The

---

**3.** In a later case, the Court made it clear that, although there was no magic in the number 12, the constitutional right to trial by jury guaranteed the right to have at least six jurors. *Ballew v. Georgia*, 435 U.S. 223, 244, 98 S.Ct. 1029, 1041, 55 L.Ed.2d 234 (1978).

Court was careful to point out, however, that the States were at liberty to require twelve person juries.

> We do not mean to intimate that legislatures can never have good reasons for concluding that the 12–man jury is preferable to the smaller jury, or that such conclusions—reflected in the provisions of most States and in our federal system—are in any sense unwise. Legislatures may well have their own views about the relative value of the larger and smaller juries, and may conclude that, wholly apart from the jury's primary function, it is desirable to spread the collective responsibility for the determination of guilt among the larger group. In capital cases, for example, it appears that no State provides for less than 12 jurors—a fact that suggests implicit recognition of the value of the larger body as a means of legitimating society's decision to impose the death penalty. Our holding does no more than leave these considerations to the Congress and the States, unrestrained by an interpretation of the Sixth Amendment that would forever dictate the precise number that can constitute a jury.

*Id.* at 103, 90 S.Ct. at 1907.

Maryland Rule 4–311(b) sets forth the law of this State concerning the size of a jury in a criminal case. That Rule provides:

> A jury shall consist of 12 persons unless the parties stipulate at any time in writing or on the record that the jury shall consist of any number less than 12.

The Rule is clear, unequivocal, and mandatory in fixing the number of jurors in a criminal case. The sole possible exception to a jury of 12 involves a stipulation by "the parties," which quite clearly means the State and the defendant, through their authorized representatives.[4] *See State v. Kenney,* 327 Md. 354, 361–65, 609 A.2d 337 (1992).

---

4. Federal Rule of Criminal Procedure 23(b) is similar to Maryland Rule 4–311(b) in that it permits the parties, with the approval of the court, to stipulate to a jury of less than 12. A 1983 amendment to the federal rule addresses the problem that arose in this case. The federal rule

■ We hold that Rule 4–311(b) means just what it says— that a jury in a criminal case must consist of 12 persons unless *both* parties agree to a lesser number. The Rule does not require that either party explain or justify a decision to insist upon the number of jurors provided by law, and we will not imply such a requirement. The position of the State's Attorney when asked to stipulate to a jury of less than 12 is analogous to that of a federal prosecutor who is asked to consent to a defendant's waiver of a jury trial in a federal prosecution, and the Supreme Court has interpreted the applicable Federal Rule of Criminal Procedure to permit the prosecutor to withhold consent without the necessity of stating any reason.

> Because of ... confidence in the integrity of the federal prosecutor, Rule 23(a) does not require that the Government articulate its reasons for demanding a jury trial at the time it refuses to consent to a defendant's proffered waiver.

*Singer v. United States*, 380 U.S. 24, 37, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965).

The defendant attempts to distinguish the rationale of *Singer* on the ground that *Singer* involved only the scope of the right to a jury trial, whereas this case also involves double jeopardy protections. Additionally, he points out, *Singer* left open the possibility that circumstances might be so compelling in a given case that the prosecutor's insistence on trial by jury might result in a denial to the defendant of an impartial trial. *Id.* Borrowing from the rationale of *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the defendant argues that when a mistrial is necessitated by bad faith conduct on the part of the prosecutor retrial is prohibited by the Double Jeopardy Clause.

---

now provides that "Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors." Our Maryland Rule has no counterpart provision.

■ Assuming, without deciding, that the intent or motive of the prosecutor in withholding consent to proceed with a jury of less than 12 may in some circumstances justify the trial judge in concluding that the consent of the State is being impermissibly withheld, this is not such a case. In *Oregon v. Kennedy, supra,* the Court held that where there was improper conduct on the part of a prosecutor and that improper conduct was intended to and did goad the defendant into moving for a mistrial, retrial was prohibited by the Double Jeopardy Clause. *Id.* at 676, 102 S.Ct. at 2089–90. It is a bit of a stretch to suggest that a refusal to consent to proceeding with a jury of less than 12, even when it is apparent that a mistrial will necessarily result, is the legal equivalent of actually engaging in prosecutorial misconduct with the specific intent to cause a mistrial. Even if we assume, however, that the withholding of consent for the sole purpose of obtaining a prosecutorial advantage would be improper, and would justify proceeding with a lesser number of jurors in the absence of the State's consent, there is simply no evidence that this was the case here.

■ The record demonstrates that the State had presented a case that would support a conviction. There is no suggestion in the record that a necessary witness had failed to appear or had recanted, or that the State had somehow failed to produce evidence needed to support an element of the charged offense. Quite to the contrary, the prosecuting attorney demonstrated his willingness to have the case decided on the record as it stood. He suggested that the jury of 12 be allowed to decide the case, provided the temporarily absent juror did not assert that his ability to decide the issues fairly had been compromised. Moreover, he interposed no objection to the defendant's suggestion that the trial judge decide the case. The trial judge's finding in this case that there was "prosecutorial manipulation" because the State's refusal to consent to a jury of less than 12 persons "manifested a deliberate intent on its part to afford itself a more favorable opportunity to convict" is clearly erroneous. There is simply no evidence of record that will support that finding, or upon

which inference of that intent on the part of the State reasonably may be based.

Although the prosecution voiced some concern about the length of time that had elapsed between the conclusion of the evidence and the resumption of deliberations, this did not appear to be the State's principal reason for declining to consent to continuation of deliberations with 11 jurors. Rather, the principal reason appeared to involve the public's perception of justice in a high profile and racially sensitive case and, to a lesser extent, the possibility of prejudice from speculation of the 11 jurors concerning the absence of their fellow juror and the long delay.

As noted above, the case was highly publicized in the Baltimore City area, and it involved a white police officer on trial for the fatal shooting of an African American youth. The prosecutor manifested a concern that not only should justice be done but that justice should appear to have been done. We understand the State's concern to have been that a substantial segment of the community, including many African Americans, might well conclude that justice had been subverted if a verdict of not guilty were returned after the State consented to the "irregular process" of allowing 11 jurors to decide the case, particularly when the excused juror was an African American and his stated reason for failing to appear was that he had been beaten by three "white guys." One might wish that racial considerations and pro-police or anti-police considerations would play no part in the public perception of justice, but that is not necessarily so. The prosecutor's expressed concern for conducting this trial in a manner that would not only be fair but appear to the public to be fair cannot be dismissed out of hand. Indeed, the trial judge expressed the same concern for the perception of justice when she declined to accept the defendant's offer to have her decide the case.

> [T]his court believes it should not be the trier of fact and the trier of law. I believe that because I do agree with the State that there is, especially in this case, a need for a perception of justice and for the process to work....

The defendant insists that his "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), means that the defendant has the right to insist that a trial continue when as many as six jurors have been lost, and that the State is obliged to consent unless it can offer a cogent or compelling reason why a jury consisting of fewer than 12 persons would not be fair. *See Hutchens v. District Court of Pottawatomie County,* 423 P.2d 474 (Okla.Crim.App.1967) (State must offer cogent or compelling reason for declining to proceed with 11 jurors); S. Schulhofer, *Jeopardy and Mistrials,* 125 U.Pa. L.Rev. 449, 527 (prosecution should be required to show a reasonable basis for refusing to stipulate to a jury of 11). We do not agree. A jury of 11, or of 6, is not the "same tribunal" with which the case began. Nor is it the jury of 12 that is guaranteed to the State and the defendant by state law.

■ Moreover, the Supreme Court has made it clear that the "valued right" of which the defendant speaks "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter, supra,* 336 U.S. at 689, 69 S.Ct. at 837. The loss of a juror due to illness or other proper cause "justifies a discharge of the jury and declaring a mistrial." *Reemsnyder v. State,* 46 Md.App. 249, 416 A.2d 767, *cert. denied,* 288 Md. 741 (1980). The defendant does not suggest that the trial judge erred in dismissing the 12th juror—indeed the defendant specifically requested that action. The manifest necessity occurred when the 12th juror was discharged and the State declined to agree to proceed with fewer than the number of jurors guaranteed by the applicable Maryland Rule.

The interpretation we accord Maryland Rule 4–311(b) is similar to that given by the New Jersey Supreme Court to an analogous rule of that State:

> There is clearly no intent that either the State or the court must give some valid reason for withholding approval. It is a rule of permissive expediency rather than of compulsory principle.

*State v. Romeo,* 43 N.J. 188, 203 A.2d 23, 29 (1964), *cert. denied,* 379 U.S. 970, 85 S.Ct. 668, 13 L.Ed.2d 563. *See also Bishop v. State,* 179 Ga.App. 606, 347 S.E.2d 350, 352 (1986) (where jury is deprived of the statutory minimum number by the proper removal of a juror, there is manifest necessity for a mistrial); *State v. McFerron,* 52 Or.App. 325, 628 P.2d 440, 443 (1981) (State may not be required to proceed with less than 12 jurors).

█ There is no requirement that the trial judge agree with the State's decision to decline to continue with 11 jurors or, where reasons are given by the State, that the trial judge agree with those reasons. Assuming, without deciding, a contrary result may be dictated where circumstances demonstrate that the State's action was intentionally oppressive or otherwise impermissible, this is not such a case.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR TRIAL; COSTS TO BE PAID BY APPELLEE.