772 A.2d 1260

**Dion Lee JOHNSON,**

v.

**STATE of Maryland.**

**No. 245, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

May 30, 2001.

540

Michael R. Braudes, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Jack Johnson, State's Attorney for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN *, DEBORAH S. EYLER and JOHN J. BISHOP (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

Dion Lee Johnson, appellant, was charged with first degree murder, second degree murder, conspiracy to commit murder, and use of a handgun in the commission of a crime of violence, in the shooting death of Van Reaves. On March 15, 1999, a jury trial on those charges commenced in the Circuit Court for Prince George's County. A mistrial was declared the next day. On June 28, 1999, a second jury trial commenced in the Circuit Court for Prince George's County. That trial also resulted in a mistrial.[1]

A third jury trial began on December 13, 1999. It resulted in appellant being acquitted of first degree murder and convicted of second degree murder and use of a handgun in the commission of a crime of violence. The court sentenced appellant to a total of twenty-five years' incarceration. On appeal, appellant presents three questions for review, which we have reordered and reworded:

I. Did the Fifth Amendment protection against double jeopardy bar appellant's December 1999 retrial?

II. Did the suppression court err in denying his motion to suppress certain evidence?

III. Did the trial court err in failing to ascertain that appellant voluntarily waived his right to testify?

For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

The shooting in this case took place on March 5, 1998, at the apartment of Van Reave's fiancée, Tineal Carter, in Suitland,

---

* Moylan, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

**1.** The conspiracy count was *nolle prossed* by the State at the end of the second trial.

Maryland. Carter was a close friend of Fard Muhammed, known as "Rico." Rico regularly went to Carter's apartment to supply her with crack cocaine. Appellant often accompanied Rico on these visits and stood watch.

Reaves did not get along with Rico or appellant. Also, he owed Rico money.

On the day in question, Carter and Reaves were in the bedroom of the apartment with three friends: Billy, Rick, and Sly. Debra Nelson was elsewhere in the apartment. Rico and appellant entered the apartment, walked into the bedroom, and greeted everyone. Rick and Sly left the bedroom. According to Carter, appellant began beating Reaves with something like a nightstick, and both Rico and appellant fought with Reaves. Billy hid in a walk-in closet. Appellant produced a handgun and shot Reaves through the eye, killing him. Appellant and Rico then fled. Carter and her friends went to a nearby gas station and called 911. They then went to a motel because Carter was afraid to return home.

Carter's apartment was sealed as a crime scene. She and Nelson were arrested a few days after the shooting when they tried to reenter the apartment. They were taken to police headquarters and interviewed about the shooting. Carter identified appellant as the person who had shot Reaves. Thereafter, appellant was arrested and charged.

Rico also was charged in the shooting death of Reaves. Sometime before appellant's second trial, Rico was tried separately, on charges of first degree murder, conspiracy to commit murder, and use of a handgun in the commission of a crime. He was acquitted of all charges.

### Appellant's Second Trial

The mistrial ruling that is the focus of this appeal occurred during appellant's second trial, in the State's case. At the outset of that trial, appellant's lawyer informed the trial court that his theory of defense was that Rico, not appellant, was the shooter.

Tineal Carter and Debra Nelson testified for the State. Carter stated that appellant and Rico entered the bedroom together and that appellant shot Reaves. Nelson testified that she was in the kitchen of Carter's apartment when she heard fighting in the bedroom. She looked into the bedroom and saw Reaves doubled over and appellant standing "over top of him with some kind of stick or lead pipe." She did not see Rico. Nelson started to leave the apartment but returned to get some clothing. She heard a bang, which she thought was a television set being broken, and then saw appellant and Rico leave the bedroom and exit the apartment. They paused before reaching the door and Rico told appellant to calm down and take a deep breath.

The testimony that precipitated the mistrial came from James Toth, another State's witness. Toth testified that he and Rico sold drugs together and that appellant "used to hang" with them. Rico and appellant told Toth that Reaves "had been messing up with the [drug] money" and that they were going to kill him. Rico and appellant had "numerous" conversations in Toth's presence in which they had stated their intention to kill Reaves. Also, a few weeks before the shooting, Toth, appellant, Rico, and someone named "Stick" assaulted Reaves.

According to Toth, sometime on March 5, 1998, he met with Rico and appellant and Rico said that he and appellant had killed Reaves. Rico explained that he and appellant had gone to Carter's apartment to kill Reaves and that Rico had pulled a gun out, but "couldn't get the shot off." A struggle ensued and the gun fell to the ground. Appellant picked it up but could not shoot Reaves because Rico was in the way. When Reaves realized that appellant had the gun, Reaves "charged" at him. Appellant fired one shot, hitting Reaves in the eye and killing him.

Toth also testified that appellant admitted that he (appellant) had killed Reaves. Appellant also said that he had promised Rico that he would "take care of" any witnesses Rico wanted him to.

Toth went on to say that, after the shooting, Rico asked him to kill Debra Nelson, and threatened to kill his family if he did not do so. Toth sought out Debra Nelson and stabbed her. He later entered into a plea agreement to a charge of first degree assault, with a sentence cap of four years. Toth had not yet been sentenced at the time of appellant's second trial.

On cross-examination, defense counsel elicited from Toth that he was afraid of Rico but was not afraid of appellant. Toth denied that his fear of Rico motivated him to blame appellant for the murder.

On redirect examination, the prosecutor followed up on this line of questioning and asked Toth what effect, if any, his fear of Rico had on his testimony. Toth replied:

It has none, because it is still going to be there. I testified in his case against him, and, you know, hopefully, I will never see him, *you know because he got off,* and it still has no bearing, because I testified to -

(Emphasis added.) At that point, defense counsel interjected and asked to approach the bench. Once there, he moved for a mistrial, stating:

I would at this time ask for a mistrial on behalf of my client. The witness for the State has just informed the jury that the co-defendant in this case, who we are attempting to place the blame on, was acquitted due to testimony that he gave.

The influence on this jury would be overwhelming to the fact that the co-defendant has already been acquitted. They can know that a man has been killed already. They could therefore place undue importance on the fact that somebody should be convicted in this case, clearly my client.

We have a theory in this case wherein my client is to testify as to certain aspects as to why he is being blamed for this murder. Clearly that issue has been generated in front of this jury, and this witness has indicated that 12 other people decided to believe his version over the version that we made here.

I don't believe that this could be deemed in any way to be harmless. It is an error that cannot be corrected, nor would I accept an instruction to that effect.

I believe this witness knew better than to say that. I am not indicating who is to blame, but I am indicating that this is an egregious error on his part, and I am asking for a mistrial on behalf of my client.

The prosecutor opposed the mistrial motion, arguing that Toth's testimony was "very vague." The trial court called a recess to consider the motion, and then denied it. After the jurors were returned to the courtroom, the trial court instructed them to disregard Toth's last answer.

When trial resumed the next morning, the parties revisited the issue of Toth's testimony. Defense counsel said:

I will say for the record that two of the jurors looked at me as I began to show some alarm, and at that time I approached the bench and requested a mistrial based on that statement that he made, and I premised that on the fact that never knowing what a jury may consider or not consider when they go through their process, when they go through that process, it is my feeling, Your Honor, that a jury, knowing now that the remaining co-defendant, when the prior co-defendant has already been acquitted, and there was a definite individual, and the State's theory is my client being the shooter in the case, that they may take whatever action they felt by way of sort of a compromise, or they may attribute more guilt to my client than would normally be assessed.

Secondly, I think it gives undue credibility to the witness, knowing that the witness had listened to his version at an earlier trial, where he basically did not indicate that the other individual was the shooter, which is our theory in this case, that the other defendant is the shooter, would give him undue reliability with this jury having heard him and found him not guilty.

I, in my assessment, do not believe that that risk can be one that can be overcome by any cautionary instruction, and the court went ahead and gave one over our objection.

I do not believe this is harmless, and it can be wiped from a juror's mind, so they in no way infer unnecessary guilt on my client.

Defense counsel then renewed his motion for mistrial. After explaining that he had discussed the matter with appellant, he added:

[Appellant], in our conversations today, shows me a lack of understanding and perhaps competency to truly understand and aid me in making this decision, so I am now taking it upon myself to do so.

Defense counsel said that he had spoken with appellant's aunt and grandmother, who concurred in his request for a mistrial. He noted that appellant's aunt had spoken to appellant and believed that appellant was "not in a frame of mind to understand what the consequences were, and what his decision-making process should include."

The prosecutor reiterated that the curative instruction had been sufficient to alleviate any prejudice. He stated:

[T]he theory that they have put forward with respect to undue credibility, and the remaining defendant, Dion Johnson, necessarily having to be convicted if the first defendant was acquitted, [is] at the most $50/50$, and in our view, just wrong.

In other words, the jury could weigh [that that] guy was acquitted, and the State has this (sic) he was the mastermind, this was the flunky, then this guy should be acquitted too.

Appellant then addressed the court. He said:

Based upon what I have seen and what I have witnessed, I wanted to be on the record. I do agree with [the prosecutor] on the prejudice of this case, and, further, I would like to go for the mistrial—no, I prefer not to go to the mistrial.

We can go to trial today, but I want to make sure that my family is protected, and make sure that I am protected, too, because this man, he is gone, and I am the flunky in this thing. I am the flunky. I am the one that takes the fall. So I want to make sure that—he is still gone.

The deal was to sit there and take the fall. That wasn't a question at first. I want to let it all be known. I am supposed to be up here to take the fall. I can't take no deal, because I am not going to go for something that I didn't do. Everything is not right.

The trial court reconsidered its prior ruling and declared a mistrial.

## Appellant's Third Trial

On November 29, 1999, approximately two weeks before his third trial, appellant filed a *pro se* motion entitled "Motion's for Dismissal—Grounds Double Jeopardy." In it, he argued that a re-trial would violate his Fifth Amendment right against twice being placed in jeopardy for the same offense. In rambling and imprecise language, he charged that the mistrial was the result of a "coached" blurt by Toth. He also argued that he had not consented to the mistrial, noting that "it is not every improper remark as conspired by all parties to challenge for a mis-trial."

On December 6, 1999, appellant filed another *pro se* document, entitled, "Double Jeopardy," in which he pointed out that he previously had requested his counsel to do various tasks, including filing a motion to dismiss based on double jeopardy grounds.

Appellant's third trial began on December 13, 1999. The transcript of the hearing begins with a request by the prosecutor to approach "on another matter in this case," followed by an off-the-record discussion. Jury selection followed. After the jury was selected, the trial court ordered a recess. Prior to the jury returning to the courtroom, counsel discussed various legal matters with the trial court. Appellant was not present, at least initially, and defense counsel waived his

presence. Appellant's motion to dismiss was not among the matters discussed. The trial then went forward. By implication, therefore, the trial court denied appellant's motion to dismiss.[2]

## DISCUSSION

### I.

As the proceedings recited above disclose, the mistrial that ended appellant's second trial was requested by appellant's lawyer, over appellant's objection. Appellant maintains that the trial court should not have granted the mistrial because he did not consent to it. He also argues that there was no "manifest necessity" for the mistrial. He contends, therefore, that principles of double jeopardy barred a retrial, and that the trial court erred in denying his motion to dismiss for that reason.

The State counters that appellant consented to the mistrial, even though he objected when his lawyer requested it, and there was manifest necessity for the mistrial in any event. Therefore, retrial was not barred by double jeopardy principles and the trial court properly denied appellant's motion to dismiss.

The double jeopardy clause of the Fifth Amendment to the Federal Constitution applies in state court criminal prosecutions through the Fourteenth Amendment. *Cornish v. State,* 272 Md. 312, 316, 322 A.2d 880 (1974) (discussing *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d

---

2. The State does not contend that the double jeopardy issue in this case is unpreserved. Anticipating such an argument, however, appellant, citing *Carbaugh v. State,* 294 Md. 323, 449 A.2d 1153 (1982), points out that "it is not at all clear that a double jeopardy contention must be preserved in the ordinary manner." Although appellant is correct that, in some cases, a claim of double jeopardy may be raised even absent a pretrial motion to dismiss, there is also authority for the proposition that a claim of double jeopardy may not be raised for the first time on appeal. *Howell v. State,* 56 Md.App. 675, 678–82, 468 A.2d 688 (1983). Nonetheless, it appears that appellant raised the double jeopardy issue below and thus preserved it for review.

707 (1969) and citing *Matter of Anderson,* 272 Md. 85, 321 A.2d 516 (1974), *Pugh v. State,* 271 Md. 701, 319 A.2d 542 (1974); *Couser v. State,* 256 Md. 393, 260 A.2d 334 (1970)).[3]

> The double jeopardy prohibition against retrial for the same offense attaches in a jury trial when the jury is empaneled and sworn.... Thus, after jeopardy attaches, retrial is barred if a mistrial is declared without the defendant's consent unless there is a showing of "manifest necessity" to declare the mistrial.

*State v. Woodson,* 338 Md. 322, 329, 658 A.2d 272 (1995) (citing *Illinois v. Somerville,* 410 U.S. 458, 467, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824); *Blondes v. State,* 273 Md. 435, 444, 330 A.2d 169 (1975)); *State v. Crutchfield,* 318 Md. 200, 207–08, 567 A.2d 449 (1989) (quoting *Cornish,* 272 Md. at 316, 322 A.2d 880). The "manifest necessity" standard was coined and explained by Justice Storey in *Perez, supra,* 22 U.S. (9 Wheat.) 579:

> [I]n all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all of the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other

---

**3.** The Fifth Amendment states, in relevant part, that no person shall "be subject to the same offense to be twice put in jeopardy of life or limb."

cases, upon the responsibility of the judges, under their oaths of office.

*Id.* at 580; *Arizona v. Washington,* 434 U.S. 497, 505–06, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *Illinois v. Somerville,* 410 U.S. at 461–62, 93 S.Ct. 1066; *State v. Crutchfield,* 318 Md. at 207–08, 567 A.2d 449; *Cornish v. State,* 272 Md. at 316–17, 322 A.2d 880.

The Supreme Court has declined to spell out fixed rules for determining when "manifest necessity" exists. The "manifest necessity" standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville,* 410 U.S. at 462, 93 S.Ct. 1066. Nevertheless, the Supreme Court has held that there must be a " 'high degree' [of necessity] before concluding that the mistrial is appropriate." *Woodson,* 338 Md. at 329, 658 A.2d 272 (citing *Washington,* 434 U.S. at 506, 98 S.Ct. 824 (footnote omitted)); *Malpas v. State,* 116 Md.App. 69, 81–82, 695 A.2d 588 (1997).

■ In *Arizona v. Washington, supra,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717, the Court examined whether there was manifest necessity for a mistrial granted after the defendant's lawyer made "improper and prejudicial remarks" in his opening statement about evidence, which would have been inadmissible. *Id.* at 510, 98 S.Ct. 824. The Court explained that when a motion for mistrial requires the trial judge to assess whether an improper remark may have affected the impartiality of the jury, the judge's decision should be given deference:

> [A]long the spectrum of trial problems which may warrant a mistrial and which may vary in their amenability to appellate scrutiny, the difficulty which led to the mistrial in this case ... falls in an area where the trial judge's determination is entitled to special respect.

*Id.* The Court went on to emphasize that, although a trial judge's decision to grant a mistrial based on his "assessment of the prejudicial impact of improper argument" will be ac-

corded great deference, the judge must not act "irrationally or irresponsibly." *Id.* at 514, 98 S.Ct. 824 (citations omitted). Rather, he must have exercised "sound discretion" in declaring a mistrial. *Id.* The Court concluded that the trial judge "exercised 'sound discretion' in handling the sensitive problem of juror bias" and, therefore, "the mistrial order [was] supported by the 'high degree' of necessity" that was required. *Id.* at 516, 98 S.Ct. 824 (footnote omitted).

> Neither party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, "the public's interest in fair trials designed to end in just judgements" must prevail over the defendant's "valued right" to have his trial concluded by the first jury impaneled.

*Id.* (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)).

In *Neal v. State,* 272 Md. 323, 322 A.2d 887 (1974), the Court of Appeals held that the defendant's constitutional protection against double jeopardy had not been violated when he was retried after the trial court, *sua sponte,* declared a mistrial because the evidence that was the fruit of a warrantless search, and that had been ruled suppressed, was placed within sight of the jury, introduced for identification, and referred to in trial testimony. The Court observed that, "[o]nce [the trial judge] perceives that the trial cannot proceed because of prejudice to the defendant, he has no choice but to declare a mistrial." *Id.* at 326, 322 A.2d 887; *Cornish,* 272 Md. at 321, 322 A.2d 880 (holding that, in a bench trial, the trial court properly had declared a mistrial upon learning that the defendant initially had agreed to plead guilty and noting that the trial judge had explained that knowledge of the guilty plea "might have been very difficult for [her] to overcome in the ultimate judgment of this case").

*State v. Blanks,* 190 N.J.Super. 269, 463 A.2d 359 (App.Div. 1983), is similar in some respects to the case at bar. In *Blanks,* the New Jersey intermediate appellate court held that there was manifest necessity for a mistrial when, in an armed robbery prosecution, the star defense witness testified (al-

though he had been admonished not to mention the topic) that he had been acquitted of charges in the same armed robbery for which the defendant was on trial. The central issue in the case was identity. The victim, a bartender, testified that two men entered his bar at about 2:00 a.m. on the night in question and robbed him at gunpoint. He identified the two men as the witness and the defendant. The witness and the defendant, both of whom were apprehended in the area soon after the robbery, each took the position that they were in the area for other reasons and had been misidentified. After the witness testified that he had been acquitted, the trial judge declared a mistrial, reasoning that, because the case was one in which the men were "going to stand or fall together," 463 A.2d at 361, *i.e.*, the jurors either were going to find that the witness and the defendant properly were identified as the robbers, or that they were not, but that they could not reasonably find that one man properly was identified and one was not, the disclosure to the jury of the witness's acquittal inevitably would prejudice the jury against the State. The appellate court affirmed, holding that the trial judge permissibly exercised his discretion to abort the trial when, upon careful deliberation, he concluded that the jurors could not erase from their minds the evidence of the witness's acquittal and could not fairly and impartially consider the case with that knowledge.

■ The case *sub judice* resembles *Blanks*. In both cases, two men participated in a crime and were tried separately on the same charges. In both cases, the jury heard inadmissible evidence that the first man tried had been acquitted. (Though appellant argues otherwise, the clear import of Toth's statement that Rico "got off," when taken in context, was that he had been acquitted of criminal charges in the killing of Reaves.) Finally, in both cases, the issues generated were such that knowledge about the outcome of the first man's trial necessarily would affect the jury's thought process about the defendant's guilt or innocence. In *Blanks*, the evidence on the central issue of identity was such that the jury only would be persuaded of the defendant's guilt if it thought that both men

had been properly identified. In the case at bar, evidence on the central issue of criminal agency was such that the jury would not conclude that both Rico and appellant had shot Reaves: only one of them could have done so. Therefore, knowledge that another jury had acquitted Rico would taint this jury's view of appellant so as to effectively eliminate the presumption of innocence. For that reason, there was manifest necessity for a mistrial.

■ Appellant contends that he had a right to a verdict from the jury in his second trial and, even though his lawyer requested the mistrial, his lawyer could not consent to a mistrial without his agreement. Therefore, the trial court erred in granting the mistrial over his objection.

1. The right to a verdict from a jury that is sworn "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *State v. Gorwell*, 339 Md. 203, 217, 661 A.2d 718 (1995) (quoting *Wade*, 336 U.S. at 689, 69 S.Ct. 834).

Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.

*Gori v. United States*, 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) (citations omitted). In *Gori*, the Court noted that this was true even when the mistrial was declared for the benefit of the defendant. *Id.* at 369–70, 81 S.Ct. 1523. In *Neal v. State, supra*, 272 Md. 323, 326, 322 A.2d 887, the Court of Appeals explained: "The trial judge's function is to see that the defendant has a fair trial. Once he perceived that the trial cannot proceed because of prejudice to the defendant, he has no choice but to declare a mistrial." Accordingly, even assuming that counsel could not consent to a mistrial over appellant's objection, the trial court did not err or abuse its

discretion in granting the mistrial.[4] Because there was mani-
fest necessity for the mistrial, appellant's third trial was not
barred by principles of double jeopardy.

## II.

Appellant filed a pre-trial motion to suppress certain evi-
dence, including written statements he made to the police. At
the suppression hearing held on that motion, the following
evidence was adduced.

On March 23, 1998, at 4:30 p.m., appellant was arrested in
Washington, D.C., by the Metropolitan Police. He was held in
a Washington, D.C., facility. Detective Charles Richardson
and Detective Troy Harding traveled to the District to inter-
view appellant.

Detective Richardson testified that he advised appellant of
his *Miranda*[5] rights after he entered the room in which
appellant was present. Appellant waived his rights and
agreed to talk to him and to Detective Harding. Appellant
was not handcuffed during the interview. Appellant never
asked for a lawyer during the interview and did not ask to
stop the interview. His demeanor was calm and he did not
appear to be ill or tired. At first, appellant said that he knew
nothing about the shooting. When faced with the evidence
against him, and because the detectives used the technique of
"minimizing" his culpability for the shooting, appellant
changed his story. No threats or coercion were used during
the interview, nor were any deals offered or promises made.
No physical force or manhandling was employed by the detec-
tives. Detective Richardson left the interview room at around

---

**4.** *See Jourdan v. State,* 275 Md. 495, 508–09, 341 A.2d 388 (1975)
(holding that there had been no manifest necessity for a mistrial that
was declared when the prosecutor became ill, even though "[t]here is
some indication that Jourdan's attorney consented to a mistrial" and
"the evidence clearly shows that Jourdan himself did not consent and,
in fact, opposed the mistrial").

**5.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966).

10:05 p.m., and Detective Harding completed the interview. Both detectives left the police station at 11:45 p.m. Detective Richardson was not aware that appellant was taken to a hospital at approximately 2:30 a.m. the next morning.

Detective Harding testified that appellant was not hand-cuffed during the interview, and that he did not use or see anyone use physical force against appellant. In apparent anticipation of appellant's testimony, Detective Harding denied telling appellant that, unless appellant gave a statement, he might go to appellant's home or there might be problems. Detective Harding testified that he did not hear Detective Richardson make any such remark. Detective Harding denied threatening that a member of appellant's family might be charged if appellant did not give a statement. The detective also stated that at the end of the interview appellant seemed "remorseful" and "concerned," but did not indicate that he was ill. At no time during the interview did Detective Harding see any police officer or anyone "touch [appellant], abuse him or hurt him, scream at him, beat on the desk." Appellant was treated "fairly, completely professionally." Detective Harding had no explanation for why appellant was taken to the hospital in the early morning hours of March 24.

Appellant's version of the interview departed sharply from those of the detectives. He testified that he was arrested at work by police officers and that he was fatigued. The officers handcuffed him and took him to a Washington, D.C., police facility. He was not given a chance to tell the detectives that he was fatigued. He was not read his *Miranda* rights, and he was not given a waiver of rights form to sign until the end of the interview. When he denied involvement in the shooting, Detective Harding reacted aggressively:

He pulled me out of the chair. First he started—he was behind me. He grabbed me by my throat and he was, like, "I don't give an 'F' what you think. I don't care—"

Detective Harding pulled him by the handcuffs and he fell on his left knee. Detective Harding said something like, "Have you ever seen [C]ops," and threatened to have the police "run

in on [his] wife." According to appellant, Detective Richardson was present when Detective Harding made that remark. Appellant testified:

> I was coerced. I was forced into writing. They said if I didn't do it they would send attack dogs and tear gas into my apartment and my wife.

Appellant further stated that he was told that if he did not write an apology it would "look bad in front of the district attorney." He claimed that he was injured by "them giving me an open can of soda" and by Detective Harding pushing him, punching him in the face and "busting" his lip. After the detectives left, a Metropolitan Police officer asked him if he needed medical treatment, and he was taken to the hospital. Appellant conceded that he did not file a complaint with the Prince George's County Police Department. He acknowledged that his treatment at the hospital took "about 15 minutes."

Appellant testified that he was coerced into writing that he was involved in the shooting; that he did not see the actual shooting; that he asked for a lawyer; that he also asked why he had not been read "[his] *Miranda*"; and that he asked for "the 5th Amendment." Finally, appellant testified that the detectives told him what to say in his statement.

In rebuttal, Detective Richardson testified that Detective Harding had not grabbed appellant by the neck or the handcuffs; that appellant had not been handcuffed; that appellant had not been "grabbed, touched, man-handled, or anything like that"; and that Detective Harding had not yelled at or mishandled appellant. Detective Harding testified in rebuttal that he had not put his hands around appellant's neck, that he had not pulled appellant out of his chair by his handcuffs, and that appellant had not been handcuffed during the interview. Detective Harding denied manhandling appellant or yelling into his ear.

Defense counsel argued that appellant's statement was the product of coercion and threats. Although he noted the "diametrically opposed versions" of the interview, he did not

mention *Miranda.* He asserted that appellant had given the statement because he did not want his wife and daughter abused and because he was "physically oppressed."

The suppression court ruled as follows:

[T]he Court is not persuaded that there was coercion, and therefore I deny his motion to suppress that statement.

Appellant contends that the suppression court erred in denying the motion because his *Miranda* rights were violated, the court did not make factual findings, and the court "flipped" the burden of proof. The State maintains that appellant waived the argument with respect to the absence of *Miranda* warnings and the suppression court otherwise did not err.

In considering the suppression court's denial of a motion to suppress, the record at the suppression hearing is the exclusive source of facts for our review. *Lee v. State,* 311 Md. 642, 648, 537 A.2d 235 (1988) (citing *Trusty v. State,* 308 Md. 658, 670–72, 521 A.2d 749 (1987)); *Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994) (citing *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438 (1982)). We extend great deference to the first-level fact-finding of the suppression court and accept the facts as found, unless clearly erroneous. *Perkins v. State,* 83 Md.App. 341, 346–47, 574 A.2d 356 (1990). Moreover, we give due regard to the suppression court's opportunity to assess the credibility of the witnesses. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992) (citations omitted). We review the evidence in the light most favorable to the State as the prevailing party. *Id.* at 281, 600 A.2d 430.

While we accept the suppression court's findings of fact, unless clearly erroneous, and we give due regard to that court's opportunity to assess the credibility of witnesses, we make our own constitutional appraisal of the effect of those facts. *Ornelas v. United States,* 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *McMillian,* 325 Md. at 285, 600 A.2d 430.

**560**

### A. *Miranda*

 We agree with the State that appellant waived the issue of whether there was a *Miranda* violation. The failure to argue a particular theory in support of suppression constitutes a waiver of that argument on appeal. *Reynolds v. State,* 327 Md. 494, 502–03, 610 A.2d 782 (1992); *Brashear v. State,* 90 Md.App. 709, 720, 603 A.2d 901 (1992). Appellant testified that he was not advised of his *Miranda* rights until the end of the interview and that he asked for a lawyer. His counsel argued that appellant was coerced into making his statements by physical force and threats, however, and did not present an argument based on *Miranda.*

### B. Factual Findings

 We also agree with the State that the suppression court made sufficient factual findings. Absent an indication to the contrary, courts are presumed to know the law and to apply it correctly. *Howard v. State,* 112 Md.App. 148, 160, 684 A.2d 491 (1996) (citations omitted); *Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583 (1976) (citing *Samson v. State,* 27 Md.App. 326, 334, 341 A.2d 817 (1975); *Schowgurow v. State,* 240 Md. 121, 126, 213 A.2d 475 (1965)). Here, the rationale for the suppression court's decision was clear. "[B]ased on her ultimate determination, the court 'obviously found the police officers' testimony during the … hearing to be credible.' " *Howard v. State,* 112 Md.App. at 160, 684 A.2d 491 (quoting *Jones v. State,* 111 Md.App. 456, 466, 681 A.2d 1190 (1996)).

*Lodowski v. State (Lodowski II),* 307 Md. 233, 513 A.2d 299 (1986), cited by appellant, is distinguishable. There, the trial court denied Lodowski's motion to suppress because it found that Lodowski had not requested a lawyer. The court did not even consider whether Lodowski's statements were voluntary. Accordingly, there were no factual findings, even implicit, to review. Here, the suppression court did make a finding on the issue of voluntariness.

 

## C. Burden of Proof

 Nor do we believe that the suppression court improperly "flipped" the burden of proof. "The rule now is that the record must reflect with unmistakable clarity the trial judge's finding that a statement or confession was, by a preponderance of the evidence, voluntary and made in accordance with *Miranda.*" *Hebb,* 31 Md.App. at 496, 356 A.2d 583. It is clear from the suppression court's finding that the court believed the testimony of the detectives and concluded that appellant's statement was not coerced. It is equally clear that the court's phraseology was simply imprecise and did not indicate that it inappropriately placed the burden of proof.

Accordingly, the motion to suppress properly was denied.

### III.

After appellant's second trial ended in a mistrial, defense counsel requested a competency evaluation of appellant. On July 12, 1999, the court ordered such an evaluation. Appellant was examined the next day and was found competent to stand trial, that is, able to understand the proceedings and assist in his defense.

Appellant's third trial began on December 13, 1999. The State finished presenting its case on the afternoon of the second day of trial. The next morning, defense counsel told the trial court that he and appellant had discussed appellant's decision whether to testify. Before addressing that issue, defense counsel mentioned that appellant had been told that he could not have a Bible in jail. Appellant then interjected and told the trial judge that the suit of clothing that had been brought to him in jail "was not even smelling right and everything, and it was wrinkled up inside my cell and everything." Defense counsel told the trial judge that appellant thought somebody might have tampered with his clothing and that appellant had told him "they put the code over the radio 187." Defense counsel further stated that he had spoken with a deputy about what appellant had told him and had learned that the deputy was unaware of any incidents having occurred.

Defense counsel commented that he had "grave concerns as to [appellant's] competency to assist [him] in presenting an adequate defense." He referenced the competency evaluation, and said:

> I will indicate to the court, I think, you have made your own observations of him during the trial. Even the prior trial. That he has not, as far as I'm concerned, exhibited rational thought at times with me. He is under the impression that, as you know from the document that's in the court jacket, he felt that there was a conspiracy actually between myself and the prosecutor. And I think as well as yourself, to have him somehow found guilty of the case.
>
> He sent a copy—he indicated he will send a copy of it to the Justice Department. I will indicate to the court again, it is my strong belief Mr. Johnson is just not in a position to render adequate assistance to me. Even in spite of the earlier examination that was done.

Defense counsel then expressed concern about appellant's ability to decide whether to testify. At his counsel's request, appellant was permitted to talk to his family, who were present in the courtroom, about his decision.

After appellant had spoken with his family, the trial judge asked him his name, age, and some questions about where he was, who the people around him were, and why they were there. The trial judge then found appellant to be oriented and asked him whether he was going to testify. Appellant said that he would abide by his attorney's decision and not testify. The trial court asked him, "After you balanced everything, you agree that's the best thing to do. Not to testify?" Appellant responded, "I'm not sure." Appellant then requested, and was permitted, to consult with his lawyer again. After more indecision on appellant's part, the following occurred.

[APPELLANT]: I'm considering because I'm scared for my life right now. I'm not speaking because the trial itself, but things that have been happening. What I've been hearing inside the jail.

THE COURT: All right. Now what is your decision?

[DEFENSE COUNSEL]: Are you saying somebody threatened you in the jail—

[APPELLANT]: (Indicating)

[DEFENSE COUNSEL]:—about testifying?

[APPELLANT]: No, not about testifying. About the situation at hand. I mean, it's officers and everything. And so I'm afraid.

[DEFENSE COUNSEL]: Officer?

[APPELLANT]: Yeah.

[DEFENSE COUNSEL]: Have done what?

[APPELLANT]: I—just a lot of stuff been happening. I mean, a lot of stuff been happening. The letter I have for you is all for peace. I'm trying to bring it out for [defense counsel]. Pull it out. Said something to me that's very important. He said what he said may matter on what he might do and all of this time, basically to get more evidence today and everything.

A lot of stuff been happening the last time I was in the court. Last time things were vandalized. Things were gone into and everything else. It's a lot of stuff been happening.

THE COURT: Are you telling the court you're afraid to testify because something will happen to you.

[APPELLANT]: It's not only that, too. It's some other things. I feel possibly because of me being implicated, and I feel like I can be framed for something. That's what I feel. So I mean—

THE COURT: You feel you are being framed here today?

[APPELLANT]: Well, the other things that I heard about my co-defendant, who was supposed to be Fard Muhammed, called Rico, I prefer not to take the stand.

The prosecutor asked that appellant be questioned under oath about any threats he had received. He suggested that appellant might be afforded extra protection, if warranted. Defense counsel did not agree, and asked for a recess "to look into something." The trial court then called a lunch recess.

When trial resumed, the trial judge again asked appellant for his decision. The following occurred:

[APPELLANT]: There's some things that [have] to be addressed still with the protection of my rights, and my family, and everything else before I go take the testimony just in case anything do get out against me.

THE COURT: I don't know what can be done in that regard, Mr. State's Attorney.

[PROSECUTOR]: We don't know what things he's talking about.

THE COURT: That's right. There's no way I can make any assurances.

[PROSECUTOR]: If, you know, if Mr. Johnson, through counsel, wanted to enunciate some specific threats, et cetera, et cetera, that were affecting him, then we would certainly attempt to respond conversely.

THE COURT: There has to be. We have not been able to substantiate any of these threats.

[APPELLANT]: I have given my counsel all of the information needed.

[DEFENSE COUNSEL]: Your Honor, in conversations with Mr. Johnson, he's indicated to me that while he was over in the bull pen, that is the lock-up area of the jail. In the jail and within the jail a ... Jordan. [Who's] the individual. An individual approached him that said somebody else had told him that Dion should keep his mouth closed and that there was four African guys and a Muslim that said something like you like to see people dead.

[APPELLANT]: No, I didn't say anything like that.

Defense counsel suggested that appellant himself tell the court about the threats. The following occurred:

[APPELLANT]: There's a person whose last name is Jordan. His first name starts with a P. He had told me that.

* * *

He had told me that he has spoke to some people who are Islamic, or religious belief, or whatever. The word has gotten around throughout the jail that if I say something, such and such will happen to my family. Something will happen to my family. They implemented (sic) they knew some powerful people.

* * *

They knew some or something of this nature. I didn't know what kind of threats it's supposed to be. The last time I remember.

THE COURT: And if you don't testify, this will not happen; is that right?

[APPELLANT]: Yes, ma'am.

Appellant said that he had been threatened the previous night by "some person in the bull pen" whose name he did not know. He further stated that "the jail officers ... have been spreading rumors about my case ... and I feel and believe that they have somehow drafted witnesses and things of that case (sic)." He explained, "They drafted evidence and whatever that I may not know about that may have come up while I'm on the stand they have drafted in here."

The trial judge then told appellant:

I think I tried to tell you when we were talking before that when you have to decide, there has to be a balance. If you decide that if you get on the stand something might come out that will be detrimental to you, that is okay. That goes into your decision not to testify. You have to balance that.

Appellant decided not to testify. The prosecutor requested that the trial court find for the record that appellant had been unable to articulate any threats sufficiently for the trial court to find a nexus between the "supposed threats" and appellant's decision, and that appellant had been unable to articulate the

threats sufficiently for the State to investigate. The trial court stated:

> Well, I thought I had, and I didn't say it clearly enough, but the threats that Mr. Johnson has [alluded] to have not been sufficiently substantiated for us to interfere with this trial. Nor were they specific enough [and they were] too vague and I have no problem believing that Mr. Johnson has some concerns, but I don't think that these matters are specific enough for the State to even initiate an investigation.

Appellant now contends that the court erred in failing to make an adequate inquiry into his mental state and the circumstances that might have led him to waive the right to testify. Appellant also contends that the record "establishes an election which was not knowing, intelligent and voluntary."

The requirements for a trial court's determination of competency are set forth in Md.Code Ann., Health Gen–I (1982, 2000 Supp.) § 12–103. That statute provides,

> (a) *Hearing.*—If, before or during a trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.

> (b) *Court action if defendant competent.*—If, after receiving evidence, the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practicable or, if already begun, shall continue.

> (c) *Reconsideration of competency.*—At any time during the trial and before verdict, the court may reconsider the question of whether the defendant is incompetent to stand trial.

 If a defendant who has been found to be competent to stand trial subsequently renews his claim of incompetency, the decision whether to reconsider the defendant's competency is within the discretion of the trial court. *Trimble v. State,* 321

Md. 248, 255, 582 A.2d 794 (1990); *Stewart v. State*, 65 Md.App. 372, 377, 500 A.2d 676 (1985).

In the present case, appellant was examined by the Office of Forensic Services of the Department of Health and Mental Hygiene on July 13, 1999. By letter of July 17, 1999, from that office, the trial court was informed that appellant was competent to stand trial. In addition, during the trial, when defense counsel commented to the court that he had concerns about appellant's competency, the trial court reconsidered appellant's competency by posing questions to him to determine if he understood what was happening around him. Appellant's answers to the trial court's questions were rational and coherent, and the trial court found on the basis of those answers that he was competent.

■■■■■■■ We see no error in the trial court's handling of the competency issue during the trial. "Once an initial determination of competency has been made, a reconsideration of the accused's competency may be made and is controlled by the discretionary language of section 12–103(c)." *Roberts v. State*, 361 Md. 346, 364, 761 A.2d 885 (2000). In that circumstance, moreover, "[t]here are no requirements for an additional hearing to make findings of fact and conclusions of law." *Stewart v. State*, 65 Md.App. 372, 375, 500 A.2d 676 (1985). In this case, appellant previously had been determined competent; nevertheless, when defense counsel raised the issue again during trial, the court exercised its discretion to revisit the issue so as to satisfy itself that appellant understood the proceedings and was oriented. This was entirely proper. In addition, we do not take issue with the court's assessment that appellant remained competent; that determination was a discretionary call by the trial judge who was in the best position to evaluate appellant's behavior and mental state. To be sure, appellant was indecisive. Indecisiveness is not the same as incompetency however. (Indeed, indecision over whether to exercise the right to testify may reflect a capacity to understand the consequences of either choice.)

 Appellant also contends that his waiver of his right to testify was coerced by "external forces."

> The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee the accused in a criminal case the right to testify on his own behalf.... Moreover, because the right to testify is "essential to due process of law in a fair adversary process," ... it may only be waived knowingly and intelligently, under the waiver standards established for fundamental constitutional rights in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).... For the waiver of a fundamental right to be made knowingly and intelligently, the accused must have a "sufficient awareness of the relevant circumstances and likely consequences" that forfeiting his right entails.

*Tilghman v. State,* 117 Md.App. 542, 553, 701 A.2d 847 (1997) (internal citations omitted). In *Tilghman,* we further noted that,

> in virtually every criminal trial, there comes a time when the defendant must choose between two reasonable alternatives, each of which requires him to waive a fundamental constitutional right.

*Id.* at 554, 701 A.2d 847.

In this case, it is clear that appellant was aware of his right to testify and was able to make a knowing and intelligent waiver of that right. He was permitted to consult with counsel overnight and with his family and counsel that morning.

Initially, appellant stated that he was relying on counsel's advice in deciding not to testify. When the trial court asked whether he agreed, appellant stated that he was "scared for [his] life." When asked whether he had been threatened about testifying, he stated that it was not about testifying. He then stated it was "officers and everything." He added that he was afraid that his possessions were being searched and "vandalized" and that he could "be framed for something." He reported that he had learned of threats the previous night, that "word has gotten around the jail that I say something,

such and such will happen to my family." He was unable to say what the threat was. He also said that "jail officers" had spread rumors, but was unable to state what they were. Finally, he expressed the fear that if he testified he could be "implicated" or "framed" for something.

The trial court found that appellant's threats had not been "sufficiently substantiated." We see no error in that determination. Appellant's responses were vague and inconsistent. Initially, he stated that he was being threatened, but that the threats were not about testifying. Although he subsequently indicated that he was being threatened about testifying, he could not state who was threatening him or what the threats were. He also expressed concern that something he said could be used to implicate him, presumably in another crime. As the trial court noted, however, the threats were too vague to be investigated. And, as the trial court also noted, the concern about saying something detrimental on the stand is one that confronts every defendant.

Appellant cites *Martinez v. State,* 309 Md. 124, 522 A.2d 950 (1987), as controlling. We disagree. In *Martinez,* the trial court asked appellant, as part of his jury waiver inquiry, whether anyone had made any promises or threatened him to give up his right to a jury trial. *Id.* at 135, 522 A.2d 950. Martinez replied, "Yes." The trial court made no inquiry into any threats or promises that had been made. In this case, by contrast, the trial court made an extensive inquiry into appellant's concerns, and then concluded that they were insufficient to prevent him from making a knowing, intelligent, and voluntary decision to waive his right to testify. We see no error in that determination.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**